No. 22,462.

FRANK C. BECK and F. L. LOVELAND, *Appellants*, v. H. W. MC-
AFEE et al., as the Board of County Commissioners of the
County of Shawnee, *Appellees*.

SYLLABUS BY THE COURT.

1. STATUTE—*Providing for County Settlement of Public Welfare Institu-
   tions—A General Law.* The law providing for the establishment of a
   county settlement of public welfare institutions in certain counties
   (Laws 1915, ch. 271, Gen. Stat. 1915, §§ 2846-2850) is a general law.

2. SAME—*Law is Constitutional.* The law is not unconstitutional be-
   cause it authorizes benevolent expenditure of public funds, derived by
   taxation, for the benefit of those who, by reason of age, infirmity or
   other misfortune, have claims on the sympathy and aid of society,
   although not paupers.

3. SAME—*Purpose of the Law* The law is benevolent in purpose, as dis-
   tinguished from a poor law, is not a supplement to the poor laws, and
   the powers conferred on the board of county commissioners are to be
   exercised independently of its powers relating to paupers and the
   county poor farm.

4. SAME—*Location of Welfare Settlement—Construction of Statute.* By
   definition of the settlement as "ten acres of land situated as near as
   practicable to the county seat," etc., the legislature located the settle-
   ment. The word "practicable" has its ordinary meaning of "capable
   of being done," and the law requires the settlement to be established as
   near the county seat as is capable of being done.

5. SAME—*Powers of County Commissioners in Locating the Settlement.*
   The board of county commissioners has no general discretion over the
   subject of locating the settlement, by taking into consideration the
   welfare of all the people of the county, the welfare of all those who
   may be cared for at the settlement and at the poor farm, and other
   matters determined by the legislature in fixing the statutory location.
   The function of the commissioners is limited to determining the fact of
   practicable nearness to the county seat.

6. SAME—*Purchase of Site.* Although in a particular instance purchase
   may not be necessary, the law contemplates purchase of a site. The
   price might disqualify an otherwise suitable site, but an otherwise suit-
   able site is not disqualified because it must be paid for.

7. SAME—*Misconception of Law by County Commissioners.* The facts
   considered, and *held*, the defendants, acting honestly, misconceived the
   law, and their authority under the law, in locating the settlement of
   public welfare institutions of Shawnee county on the poor farm, some
   three miles from Topeka, the county seat.

Appeal from Shawnee district court, division No. 2; GEORGE
H. WHITCOMB, judge.    Opinion filed July 5, 1919.    Reversed.

*George T. McDermott, A. M. Harvey, Thomas A. Lee,* all of
Topeka, *E. H. Gemble,* and *Robert Stone,* both of Kansas City,
Mo., for the appellants.

*Hugh T. Fisher,* county attorney, *Tinkham Veale,* and *Irwin
Snattinger,* assistant county attorneys, for the appellees; *E. B.
Smith,* of Topeka, of counsel.

The opinion of the court was delivered by

BURCH, J.: The action was one to enjoin the board of county
commissioners from locating the county settlement of public
welfare institutions on the county poor farm. A demurrer to
the petition was sustained, and the plaintiffs' appeal.

The statute involved reads as follows:

"SECTION 1. Each county within this state having a population of
more than 60,000 and less than 75,000 may establish and maintain a set-
tlement of public welfare institutions as defined in section 2 of this act,
and shall have power to issue bonds in a sum not exceeding $50,000, the
proceeds of which shall be used in the purchase of lands and in the erec-
tion, furnishing, and equipment of buildings. . . .

"SEC. 2. A county settlement of public welfare institutions shall con-
stitute at least ten acres of land, situated as near as practicable to the
county seat, with buildings erected thereon as follows: (1) a building to
be known as a county home, and this building shall be used for the ac-
commodation of persons who have no other home and for the temporary
detention of delinquent and dependent children; (2) a building to be
known as the county hospital, where diseased persons as designated by
the board of county commissioners may be cared for and treated; (3) a
building to be known as the tuberculosis hospital, where persons suffer-
ing from tuberculosis may be treated. The board of county commission-
ers shall have power and it is its duty to charge and collect from persons
cared for, or their relatives or representatives, in said institutions, a sum
sufficient to pay the actual cost of such care in all cases where such collec-
tions can be made, but no one shall be refused care and accommodation in
such institutions because of their inability to pay such charges. All of
the buildings provided for herein shall be modern in every way, and shall
be constructed and erected as the board of county commissioners may
direct.

"SEC. 3. Each county settlement of welfare institutions as herein pro-
vided shall be conducted under the immediate direction of the board of
county commissioners, and the board of county commissioners is empow-
ered to employ such persons as may be necessary for the maintenance of

the different institutions: *Provided,* That all of the laws of the state concerning public health and the rules and requirements of the state board of public health shall be complied with..

"SEC. 4. The board of county commissioners may receive donations and bequests of either money or property for the betterment and support of the settlement of public welfare institutions, and shall at all times encourage the use of such institutions by those who are able to pay for such use, and shall encourage the employment about such institutions of persons who are otherwise homeless, to the end that such institutions may be regarded and used by those who are destitute of home surroundings and accommodations, regardless of whether they are also destitute of money.

"SEC. 5. This act shall not be construed as repealing any laws now in force, but shall be supplementary to other acts of like character." (Laws 1915, ch. 271, Gen. Stat. 1915, §§ 2846-2850.)

Bonds in the sum of $50,000 were duly voted, and the commissioners undertook to execute the provisions of the statute. When they definitely determined to locate the settlement on the poor farm, some three miles from the uttermost limit of Topeka, the county seat, the plaintiffs challenged their authority to do so. The plaintiffs are taxpayers, qualified to maintain the suit, and are the presidents, respectively, of the Rotary Club of the city of Topeka, and the Shawnee Medical Society. The Rotary Club is an organization of business and professional men, which has for one of its purposes lending organized assistance to meritorious projects of a philanthropic and public nature, and for some time has been interested in procuring better housing conditions for indigent, sick and defective persons. The Medical Society is an organization of physicians and surgeons, which has for one of its principal purposes consideration of problems involving general health of the community and care of the poor who become sick.

The grounds of the petition were that the commissioners misconceived the purpose of the law and the nature and extent of their authority. While radical change in the attitude of individual members of the board before and after the bonds were voted is pleaded, fraud and bad faith are not issues. It is necessary that the settlement have fire protection, abundant water supply and good sewerage, which are readily and adequately supplied at a location where municipal facilities may be utilized, and not otherwise. Easy access to improved streets and street-car lines is a desideratum. In other respects the

type of institution contemplated by the statute, and its practical administration and success, particularly the hospital feature, are such that the settlement is essentially urban, and not rural. Tracts of land adjoining the city or adjacent to it, meeting all the requirements of the statute, were passed by. These tracts are purchasable at prices within the contemplation of the act, and from a financial standpoint little or nothing would be gained by using land already owned by the county, because of the increased cost of constructing the buildings of the settlement out on the poor farm; consequently, the commissioners have not, in fact, dealt with the specific problem of practical nearness to the county seat, and the petition charges they so far transgressed the limits of their authority that locating the settlement on the poor farm would frustrate the intention of the legislature in passing the act.

From the foregoing summary of the petition, it is apparent the question presented is one or statutory interpretation.

At the very threshold of the inquiry we are met by two legal questions, not discussed by counsel, but which cannot be ignored, because of their intimate relation to the intent of the act.

While the act is general in form, it was manifestly drawn with the city of Topeka, as the county seat of Shawnee county, at the focus of the legislative vision. The court has just concluded another of its frequent considerations of the subject of classification (*Patrick v. Haskell County,* ante, p. 153), and is of the opinion the act is general, and not special.

The most casual inspection of the statute discloses that it is a benevolent and not a pauper statute, and the question arises: How far may the legislature go in authorizing counties to expend money in benevolence? The constitution contains the following provision:

"The respective counties of the state shall provide, as may be prescribed by law, for those inhabitants, who, by reason of age, infirmity, or other misfortune, may have claims upon the sympathy and aid of society." (Const., art. 7, § 4, Gen. Stat. 1915, § 215.)

In the "seed-wheat" case, *The State, ex rel., v. Osawkee Township,* 14 Kan. 418, this section was interpreted. The purpose of the statute involved was described as follows:

"This legislation must be construed in the light of known facts. For reasons unnecessary here to recount, in some portions of the state last

Beck v. Shawnee County.

season there was a total, and in others a partial failure of the crops. It was generally understood that many farmers would come to this spring's sowing with little or no seed, and with stock weakened for lack of grain. To make good this lack is the evident purpose of the act, to provide grain for seed and feed. Its aim is not to furnish food to the hungry, clothing to the naked, or fuel to those suffering from·cold. It is not the helpless and dependent, whose wants are alone sought to be relieved. If it were, the fact that many who are neither helpless nor dependent might obtain assistance through its administration, would be no valid objection to the constitutionality of the law. It contemplates a class who have fields to till and stock to care for, and purposes to help them with seed for their fields and grain for their stock, that thus they may pursue with better prospects of success their ordinary avocations. It taxes the whole community to assist one class, and that not for the purpose of relieving actual want, but to assist them in their regular occupations." (p. 423.)

In holding the statute unconstitutional, the court, speaking by Mr. Justice Brewer, said:

"The relief of the poor, the care of those who are unable to care for themselves, is among the unquestioned objects of public duty. In obedience to the impulses of common humanity, it is everywhere so recognized. Our own constitution but gives utterance to the universal voice when it says, 'The respective counties of the state shall provide, as may be prescribed by law, for those inhabitants who, by reason of age, infirmity, or other misfortune, may have claims upon the sympathy and aid of society.' Art 7, § 4. It must be borne in mind, however, that the term 'poor' is used in two senses. We use it in one sense simply as opposed to the term 'rich.' . . . We use the term also to describe that class who are entirely destitute and helpless, and therefore dependent upon public charity. . . . Now, when we speak of the relief of the poor as a public duty, and one which may justify taxation, we use the term only in the latter sense. We have no thought of asserting that because a ·man is not rich, or even because he has nothing but the proceeds of his daily labor, therefore taxation may be upheld in his behalf. Such taxation would be simply an attempt on the part of the state to equalize the property of its citizens. Something more than poverty, in that sense of the term, is essential to charge the state with the duty of support. It is, strictly speaking, the pauper, and not the poor man, who has claims on public charity. It is not one who is in want merely, but one who, being in want, is. unable to prevent or remove such want. There is the idea of helplessness as well as of destitution. · We speak of those whom society must aid, as the dependent classes, not simply because they do depend on society, but because they cannot do otherwise than thus depend. Cold and harsh as the statement may seem, it is nevertheless true, that the obligation of the state to help is limited to those who are *unable* to help themselves." (pp. 421, 422.)

There is fair ground for saying that, as applied to the facts of the particular case, the decision was sound enough; but the

argument by which the decision is attempted to be supported is unsound. The framers of the constitution had a larger vision of the proper function of the government created, than the court. It ought to have been apparent to the court, even in 1875, that, from every standpoint, it is better for the state to rescue an individual before he crosses the deadline of pauperism.

An examination of Charles Richmond Henderson's book, "Modern Methods of Charity," devoted to an account of systems of relief, public and private, in the principal countries employing modern methods, discloses a general recognition of the necessity for a preventive, protective, and prophylactic social welfare policy, and a general acknowledgment that public and private charity are parts of one system, both necessary, and complementing each other. In December, 1913, the director of the census submitted to the secretary of commerce a report on the benevolent institutions of the United States, prepared by experts, which is a veritable mine, rich in information concerning the subject of public and private benevolence. In connection with certain statistics, the following observations were made:

"In general, these facts seem to indicate an increased sense, on the part of the state, of its responsibility for the care of those who are sometimes called 'wards of the state.' In the past, benevolent institutions have been generally regarded as representing the element of personal or private sympathy for individual distress. There appears to be arising, however, a realization that even where distress does not necessarily go so far as pauperism, it involves detriment, if not danger, to the welfare of the community, and that dependents of all classes may properly come within the scope of public supervision and control. This has already been indicated in connection with the statistics for the different classes of benevolent institutions, but it comes out still more clearly in these tables, which show that 35 per cent of the total number of institutions are recipients of public aid, as distinguished from private donations; that 31.8 per cent of the total incomes of all institutions is from public appropriations, and that the highest average receipts per institution from any source are from such appropriations." (p. 79.)

While, therefore, it is indeed true, as stated in the opinion in the "seed-wheat" case, that the constitution of this state gives utterance to the universal voice of sympathy, it does much more: It gives voice to a universally recognized state duty, to be discharged in the interest of the public welfare; and

Beck v. Shawnee County.

the court's conclusion is that, notwithstanding the decision in the earlier case, the statute at present under consideration is constitutional and valid.

Care of the pauper is simply a part of the social burden. Since the pauper is both indigent and incapable of self-help, and since no one else is charged with the duty of keeping him, the state must, of necessity, take care of him. The burden is purely economic in character, and is placed on localities. In this state the county is the unit, and the poor farm is the place of maintenance. Health and comfort of inmates are looked after, and Thanksgiving dinners are served in November of each year; but the poor farm is to the indigent what the county jail is to the misdemeanant, so far as eleemosynary motive is concerned. Whatever there may be of benevolence is purely incidental, and a code of laws has been enacted giving the local administrative body authority to cope with every phase of poor-farm care of paupers. The statute under consideration is of precisely the opposite character. Benevolence comes first, and the settlement of public welfare institutions, comprising home, hospital and sanitarium, becomes the county inn for all travelers on life's Jericho road.

There is a matter of sentiment, but of ingrained, and for some time to come ineradicable, sentiment, which may be referred to here. The word pauper suggests such utter worthlessness that it awakens disgust; and to him who goes there, "over the hills to the poorhouse" means a succession of drab days, waiting for death. At the national conference of social work held at Pittsburg, Pa., in 1917, a paper was read on the subject of institutional care of the aged. If the author, I. L. Nascher, M. D., had read the Kansas statute of 1915, he would have noted that by the home feature of the welfare settlement the Kansas legislature had already taken a decisive step toward realization, in a practical way, of his thought and hope:

"There is no doubt in my mind that a thorough investigation will result in revolutionizing our present methods of caring for the aged. Instead of forcing them into the humiliating, degrading position of being paupers of the almshouse, we will look upon them as we look upon the child in the asylum or the patient in the hospital, as inmates of homes for the aged; we will look upon them with pity instead of scorn, with sympathy instead of indifference. We will learn how to conserve their usefulness so that they will not be so heavy a burden upon the com-

munity, and may even become an asset instead of the positive liability that they are at present. In public institutions we will learn how to conserve their happiness by making the institution a home and not a prison. In public and private institutions we will learn how to instill self-respect, arouse hope, and stimulate ambition, instead of killing every spark of self-respect, hope, and ambition that the aged dependent may have when he enters his final refuge. In all we will learn how to increase the happiness, promote the health, and prolong the lives of those to whom we owe, in gratitude, our best endeavors." (Proceedings National Conference of Social Work, 1917, p. 356.)

Now, what are the relations of the board of county commissioners to the county settlement of welfare institutions project?

Because of limitations on forms of municipal organization and methods of municipal administration, it was necessary that the settlement be built and managed by the board of county commissioners; but by the very terms of the act, their poor-farm powers are not involved. The welfare-settlement law is not supplemental to the poor law at all. The poor law is not affected, and the settlement law is supplemental to other acts of like character only, that is, to other benevolent acts. The result is, the powers of the board are to be exercised, not in amalgamation with, but independently of, its poor-farm powers.

The statute is significant for what it does not say. The poor farm being the fundamental pauper institution of the state, the legislature was not ignorant of the fact that Shawnee county, and such other counties as may qualify under the act, possess poor farms; but no authority to consider the poor farm, in locating the county settlement of public welfare institutions, is mentioned. It would have been very easy, had the legislature desired, to add a proviso that if the county possessed a poor farm, lying in the vicinity of the county seat, the settlement might be located there. On the other hand, the language of the statute is that the funds provided "shall be used in the purchase of lands and in the erection, furnishing, and equipment of buildings." The mandate extends to the purchase of lands, the same as to the erection of buildings. It may be conceded that the commissioners might accept a conveyance, for a purely nominal consideration, by way of gift, although the authority to accept donations, conferred by section 5, extends to money and property for betterment and maintenance only. The words

of the statute are important, however, as indicating quite clearly that the poor farm as a site for the settlement was not in the mind of the legislature.

Funds for the scheme expressly include funds for the purchase of necessary land, and it may be assumed the legislature understood it would be, or at least might be, necessary to pay the market price. In this instance the bond issue is for the maximum sum allowed for both purchase of land and erection of buildings.

Having provided funds for the type of settlement it was creating, the legislature proceeded to locate it, and this was done by making location a part of the definition of the settlement—"ten acres of land, situated as near as practicable to the county seat." In this instance the settlement must be located as near as practicable to the city of Topeka. The county commissioners have no general discretion in the matter. They simply determine the fact of practicable nearness to Topeka. Determination of the fact requires, indeed, the exercise of judgment. Several tracts of land may be eligible, and a choice must be made; but location by law follows good-faith ascertainment of the fact. (*Schaake v. Dolley*, 85 Kan. 598, 610, 118 Pac. 80.)

The brief on behalf of the commissioners states their attitude, and discloses the fact that they regard the statute as conferring on them very much the same discretion in establishing the county welfare settlement as they possess in selecting a poor farm:

"We have now come, in our judgment, to the *one real question* in the case, namely, *whether or not the board of county commissioners of Shawnee county has the discretionary power to locate this county settlement,* so long as they use their honest judgment, and as near to the county seat as they deem practicable for the use and benefit of all the people of Shawnee county. The act reads on this point, that the building shall be located 'as near as practicable to the county seat.' The court should not lose sight of the fact that *every person in Shawnee county is and should be equally interested* in this project, and that the board should consider the farmers in the country, the citizens of Silver Lake, Rossville, Auburn, and Richland, all the voters of Topeka in general, as well as the appellants in particular." (The italics are those of the brief.)

Elsewhere it is affirmed the commissioners are clothed with power "to represent Shawnee county" and to use their own judgment. It is suggested that the statute is supplemental to

the original act of 1862, giving authority to purchase a poor farm, and it is asserted that if, in the judgment of the commissioners, ten acres or more of the poor farm meet the requirements of the welfare settlement, and can be spared for that purpose, other land need not be purchased. It is said that a hard-surface road will be built connecting the pavement in North Topeka with the farm, and connecting with hard-surface roads to other parts of the county. Reference is made to the reliability of the automobile as a means of communication. At the oral argument, a bus line from the farm to the town was suggested as solving the problem of communication. It is stated the commissioners advised themselves of the location of similar institutions in other parts of the country before choosing the poor farm, and particular reference is made to the Warrenville farm, which is an hour's drive by motor car from the public square of the city of Cleveland, Ohio. It is said the board was bound to take into consideration the advantages and disadvantages that will accrue to those for whose benefit the act was passed, and the present buildings on the county farm are significantly described as dilapidated cottages, exposed to the dangerous risk of fire. Summarizing, the brief continues:

"The Shawnee county farm on a macadamized road would be about four miles' drive by automobile from the heart of Topeka. As we have said before, the court must conclude that the board has acted in such a manner as to consider all these different things, and that the location of this settlement has been placed on the county farm for the benefit and convenience of all the people of Shawnee county at the present time, taking into consideration the future development of Topeka and Shawnee county."

The trouble with this conception of the statute is that the legislature considered the interest, benefit, and convenience of all the people of the county, present and future, and of all those who might be cared for at the welfare settlement and the poor farm, and located the settlement at the county seat, where other county buildings are located; not in the town, but as near as practicable to it; and the commissioners have no authority to revise the work of the legislature. Whatever the opinion of welfare workers in other states may be, and whatever the commissioners' notion of an ideal location may be, the legislature preferred what is essentially a city, to a farm location, and expression of its will ends debate on the subject.

Beck v. Shawnee County.

In locating the settlement, the legislature plainly had in mind the relation of the unique kind of institution created to local conditions. The institution has economic as · well as humanitarian features, and collects the cost of service from all who can pay. No one is denied admittance for lack of funds, but no one is denied admittance because he has funds. On the other hand, people with funds, but without home, are to be encouraged to make the institution their home, a conception incompatible with the pauper and poor-farm ideas. By no means all of the persons cared for will be physically helpless, or even inactive. Very likely few of them will have · automobiles to speed them over hard-surfaced roads. Many of them may take great comfort in attending the various churches, societies, · and other organizations of which they are members. Others may make use of libraries and reading rooms, and of parks and other municipal recreation facilities. An ambulatory patient from the hospital may even desire to go to the movies occasionally, without waiting for the poor-farm bus. City physicians and surgeons will be able to extend their services to the institution regularly, as a part of the day's work, if it be grouped with other homes, hospitals, and sanitaria of the city, but not otherwise. In other respects it is essential that the institution be close to the county seat.

Words of a statute are to be construed according to the context and the approved usage of language (Gen. Stat. 1915, § 10973). In this instance the meaning of the word "practicable" is the ordinary meaning, "capable of being  . . . done or accomplished" (Webster's New International Dictionary, title, practicable), and the statute requires the settlement to be established as near the county seat as is capable of being done. Cost may disqualify a site very near. While not probable, it is conceivable that profiteers may raise the price of every available site within three miles to such an extent that the apportionment of funds between site and equipment, contemplated by the statute, cannot be carried out; but a site which is otherwise suitable is not disqualified because it must be paid for, and if the poor farm becomes a candidate, it does so simply as a tract of land.

Because of the radical difference between the poor farm and a benevolent general welfare institution, the legislature did

not disturb the one in creating the other. Paupers may be admitted to the home, hospital, and sanitarium, but paupers are not all alike. They are probably subject to as many classifications as delinquents. (See, *The State v. Heitman,* ante, p. 139.) Some may be incorrigible, or otherwise undesirable in the settlement home. It may be necessary at any time, for the welfare of a particular pauper, or for the welfare of the institution, to remove him to the poor farm. This fact gives the commissioners no more authority to take the welfare settlement bodily to the poor farm than the fact that paupers now inmates of the poor farm need better buildings and fire protection.

The result is, the commissioners, acting honestly, but misconceiving the statute and the nature and extent of their authority under the statute, have solved a very different problem from the one proposed to them, and they have left the problem presented by the statute unsolved.

The judgment of the district court is reversed; and because it is expressly conceded by the commissioners that the case stands or falls on the questions raised by the demurrer to the petition, the cause is remanded with direction to grant the injunction.

MARSHALL, J. (dissenting) : "Public officers who are required by law to perform duties involving the exercise of judgment and discretion cannot be controlled by injunction while in good faith performing such duties." (*Hessin v. Manhattan,* 81 Kan. 153, Syl. ¶ 1, 105 Pac. 44.) "In the absence of fraud, corruption, or other misconduct the substantial equivalent of fraud, the findings of the board of county commissioners are conclusive on the courts." (*Stevenson v. Shawnee County,* 98 Kan. 671, 676, 159 Pac. 5.) Under these and numerous other decisions of this court, where fraud on the part of officers in whom a discretion is vested is not alleged, a cause of action is not stated.

Fraud is not alleged in the petition, but it is said that the county commissioners misconceived the purpose of the act and have acted accordingly; and that, therefore, the action of the board is illegal and in violation of law.

The statute, so far as it is material to the matters under consideration, reads:

"Each county . . . shall have power to issue bonds . . . the proceeds of which shall be used in the purchase of lands and the erection, furnishing, and equipment of buildings . . . (Gen. Stat. 1915, § 2846.)

"A county settlement of public welfare institutions shall constitute at least ten acres of land, situated as near as practicable to the county seat, with the buildings erected thereon. . . . All of the buildings provided for herein shall be modern in every way, and shall be constructed and erected as the board of county commissioners may direct." (Gen. Stat. 1915, § 2847.)

The statute does not undertake to point out either the land on which the settlement shall be located or the distance it shall be from the county seat. The statute does say, however, that the settlement shall be "situated as near as practicable to the county seat," but that does not mean that it shall be at the nearest possible place. The duty of selecting the place is imposed on the county commissioners, who must necessarily exercise a discretion in making the selection. That discretion cannot be controlled by the courts. Until the board acts fraudulently, or in bad faith, it cannot be interfered with.

The opinion states that "no authority to consider the poor farm, in locating the county settlement of public welfare institutions, is mentioned" in the law. No location is excluded by the act, except such as is not as near as practicable to the county seat. The commissioners are at liberty to obtain or purchase land from any owner—from the county as well as from private parties. It cannot be said that the poor farm was not in the mind of the legislature when it provided that the proceeds from the sale of bonds shall be used in the purchase of lands, and in the erection, furnishing, and equipment of buildings. It is immaterial whether the location is separate and apart from the poor farm, or adjoining it, or a part of it. In either case, the question for discussion is: Who exercises the discretion to determine the location, and who considers all the elements which shall determine the selection of that location? The answer is: The board of county commissioners. It is proper for the board to consider the interests of all the people of the county, including the plaintiffs, in deciding the practicability of the location. No one contends that the location shall be elsewhere than at the nearest practicable place to the county seat; but the legislature committed the selection of that place to the county commissioners.

It is conceded that they can accept a gift of land for the settlement, as well as to obtain it by purchase. The county owns a body of land large enough for the poor farm and for the settlement. It can use its own land for that purpose, as well as ten acres that might be bought across the road.

What must be taken into consideration in locating the site for the settlement? Nearness to the county seat is one of the things, because the statute makes it so; ability to make the buildings modern is another one, also required by statute; while accessibility, fertility and amount of land, and the possibility of acquiring other adjoining land in the future, are other matters that are within the contemplation of the statute and should be considered.

"As near as practicable to the county seat," does not mean within one-half mile, nor within one mile, nor within two miles, nor within any other prescribed distance; but it does mean that the settlement shall be located at a place as near to the county seat as will supply all the conditions necessary to enable the county commissioners to carry out the purposes of the law.

Such an institution, to be modern, must have a sewer system. The sewer system of the city cannot be depended on if the institution is located outside Topeka. The sewer system of the city has been built by taxation, largely in taxing districts, to serve specified territory. The city cannot be compelled to receive and dispose of sewage from outside the city limits.

An abundant supply of water is absolutely necessary, and is a most important thing to be considered in locating the institution. It will be necessary for the institution to have its own water supply, because the city cannot be compelled to furnish water outside the city limits; and it may not be advisable for the city to go outside to furnish water, even if it has the power to do so.

The institution should be easily accessible; that was probably one of the purposes of the legislature in requiring that the institution be placed as near to the county seat as practicable. It is argued that the locations mentioned in the petition are close to the street-car tracks in Topeka. A street railroad is only one means of transportation; there are also steam

railroads; but automobiles and motor trucks are fast displacing both street and steam railroads for transportation over short distances. Good roads are the order of the day; they are being built largely for the use of automobiles and motor trucks.

The inmates of such an institution should have an opportunity to work in some healthful, useful way. For this purpose there is no work that is better than that of producing things from the soil. This requires fertile soil. Then such an institution as is contemplated should be located on that kind of soil, and the amount of land occupied should be sufficient to give every inmate, that desires it, all the work of that kind that he wants to do. Ten acres, the minimum, probably will not be sufficient for that purpose. The law contemplates three buildings, one for the homeless and for delinquent and dependent children, one for diseased persons, and one for those afflicted with tuberculosis. Three institutions, one each of the kinds named, all located on ten acres of ground, would produce a crowded condition. More land will be required in the future. Topeka is growing, and expects to grow more. Lands within a mile of the city are rapidly increasing in value. The location should be at a place where other lands may be obtained in the future at an expense which will not be prohibitive. This may very properly have been one of the reasons why the commissioners did not locate the institution closer to Topeka.

The tract selected is four and one-half miles from Topeka. In the absence of any charge of fraud or of bad faith, but with the tacit admission that the commissioners have acted in good faith, how can the court say that their decision is not right? How can the court say that they did not take into consideration every element entering into the question of practicable proximity to Topeka?

The commissioners have a wide discretion in choosing the location for the institution; a discretion given by law; one that cannot properly be controlled by the courts until the commissioners act fraudulently or in bad faith; and I see no reason for saying that they have misconceived the purpose of the law in selecting a site three miles, or four and one-half miles from Topeka, or by using a part of the poor farm for the settlement.

JOHNSTON, C. J., joins in this dissent.

WEST, J. (dissenting) : While agreeing with much that is said in the opinion, I am impressed with the fact that the matter is presented by demurrer to the petition, to which pleading only can we look for the grounds on which to act. The sole issue thus presented is simply this: Has the board in the matter of location violated the statute, or has it exercised its proper discretion? This question is to my mind answered by the dissenting opinion. The use which the board may have intended to make of the home when erected is not before us for consideration.