No. 25,871.

THE CITY OF KANSAS CITY, *Appellee*, v. WOODS BROTHERS CORPORA-
TION, (THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY
OF WYANDOTTE), *Appellant*.

SYLLABUS BY THE COURT.

MUNICIPAL CORPORATION—*Public Levee—Platted and Dedicated by the Owner
as Part of Town Site—What Constitutes a Diversion by the City Not In-
consistent With the Purposes for Which Levee Was Originally Dedicated—
Power of City Over Public Levees.* Where a strip of land on the bank of a
navigable stream was included in a town site and platted and dedicated as
a public levee, but through want of river navigation such strip of land was
not so used for over half a century, and where by accretion the strip of land
so dedicated had increased in acreage to many times its original extent, but
remained for many years in disuse, subject to overflow by recurring floods,
and a seed bed for noxious weeds and a breeding ground for malaria, at the
threshold of a large and rapidly growing city, it is held that it was not be-
yond the discretionary powers of the city government to lease the property
and grant a license for its use to a private corporation for a term of years
for a consideration of money rent and upon condition that the lessee or
licensee should construct certain desirable improvements on the property
designed to protect it from floods and to make it sightly, sanitary, and
consistently useful with its original purpose as a public levee, and tending
to promote such use, and where the contract stipulates that no use shall
be made of the property at variance with nor prejudicial to its actual or
potential use as a public levee.

Appeal from Wyandotte district court, division No. 1; EDWARD L. FISCHER,
judge. Opinion filed November 8, 1924. Affirmed.

*Guy E. Stanley,* of Kansas City, for the appellant.
*H. J. Smith,* city attorney, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an amicable action to obtain a declaratory
judgment on the validity of a contract by which the city of Kansas
City leased a certain tract of land to Woods Brothers' Corporation
for a term of years. The land involved consists of what once was a
narrow strip of platted ground in the original town site of Wyan-
dotte, now Kansas City, on the right bank of the Missouri river,
north of the mouth of the Kansas river. The original dedicators of
the town of Wyandotte set aside this strip of ground in 1857 for a
public levee. At that early time and for some years following there
was considerable navigation on the Missouri river, and the levee

was, or might have been, of some potential public service incidental thereto. With the coming of railroads, however, river navigation declined and the strip of land in question was left in idleness and neglect. For over half a century it has been of no practical service as a public levee. By accretion of silt and slow recession of the Missouri river, the original narrow strip along the river bank dedicated as a public levee in 1857 has grown until there are now about 111 acres in the tract. Some shanties have encroached thereon, some small industries have been conducted there on sufferance, but for the most part the platted levee and its accretions have been put to no use. Surrounded by the industry and bustle of a great and growing city, it has remained in idleness and unsightliness, subject to occasional overflow, a seed bed for noxious weeds and a breeding ground for malaria and kindred diseases. South of the platted strip of ground in question, and westward upstream for several miles along the Kansas river, is the Kaw Valley drainage district, where a system of dikes and embankments has been constructed for purposes of protection against floods. To the northward also, along the right bank of the Missouri river, is the Fairfax drainage district, where an extensive system of dikes has been erected for the same purposes. To link up the Fairfax drainage dikes with the Kaw Valley drainage dikes by improving this long-neglected public levee, as well as to put the property to some practical use consistent with the purpose of its original dedication, and to have it cleaned up and made sanitary and sightly, the city has leased the levee and its hundred-odd acres of accretions to the defendant corporation for thirty years at twenty dollars per acre per anum. The lease contemplates the diking of the property to prevent recurrence of floods and submergence, the laying out of streets, the construction of sewers and paving, the erection of industrial plants and warehouses, and the construction of facilities for any river traffic which may materialize during the term of the lease—all consistent with and apparently helpful to and promotive of the use of the property as a public levee. It is provided:

"The party of the second part agrees that said property shall not be used for any purpose which will conflict with its use as a public landing or public levee, party of the first part reserving to itself all such rights, or in violation of any state law or city ordinance now in force or that may be in force in the future and during the life of this lease."

The trial court made findings of fact and held—

"That the city being in full lawful control, possession and dominion of said land, had the lawful right and authority to execute the lease involved in the form and manner in which it was executed, and it is of material benefit to the city, its citizens and taxpayers and the public, and that the terms of such lease [should] be carried out.

"That such lease does not interfere with or impair the right of the city to use such land for levee purposes should the need therefor arise, and does not impair or cloud the legal title held by the defendant county.

"That such lease was in all respects valid and all the terms thereof were and are within the lawful power and authority of the grantor therein."

Were this conclusion and judgment correct?

The city had full dominion and control over this so-called public levee. (*Douglas County v. City of Lawrence,* 102 Kan. 656, 171 Pac. 610.) The city could not give countenance to any disposition of the property at variance with the purpose for which it was dedicated. (*Comm'rs of Franklin Co. v. Lathrop,* 9 Kan. 453; *The State, ex rel., v. City of Manhattan,* 115 Kan. 794, 225 Pac. 85, and citations.) But here there is no attempt to divert the property to a use at variance with the purpose for which it was dedicated. Rather the contrary. By the lease it is proposed to improve the property so that it will be better adapted to the purpose of a public levee, and perchance to attract to it such traffic as usually is conducted on and about a public levee. The city has unquestioned power to lay a pavement and construct driveways on this public levee. It has power—and probably it is its duty—to improve this property, to clean it up and make it sightly and sanitary, and to dike it to prevent recurring overflows. And it would be a narrow construction of the city's powers to hold that, while it could lawfully make these improvements itself, it has no power to cause them to be made through a contract with a lessee or licensee. Nor will it be disputed that whether or not a particular use of land dedicated as a public park, levee or commons amounts to a diversion from the uses for which it was dedicated depends upon the circumstances of the dedication and on the intention of the dedicator, and is therefore largely a question of fact. Thus in *Bailey v. City of Topeka,* 97 Kan. 327, 154 Pac. 1014, where a gift of land had been made to the city for a public park, and the deed of gift provided that "said real estate shall be inalienable by said city of Topeka, either by way of deed, conveyance, *lease,* or in any other manner" (p. 328), the question arose whether *concessions* in the park for refreshment and lunch stands, and to rent boats, bathing suits and dressing rooms, for

which the city exacted and received pay, was a perversion of the purposes for which the property was given to the city. The court said:

"We see nothing in the conduct referred to that is inconsistent with the public character of the park or that conflicts with the terms of the gift. The exclusive character of the privilege conferred is not the basis of any legitimate objection. For as no one has a right to engage in the activities referred to except by permission of the city, no one is wronged by the monopoly created. . . . Nor do they involve the loss of control over it by the public officers. Clearly it is not inconsistent with the conditions imposed by the donor of the property that visitors to the park should be afforded facilities for obtaining refreshments, for boating and for bathing. No reason exists why they should not pay a fair price for what they eat or drink or for the boating or bathing equipment they use. The city might through its employees furnish these conveniences directly, collecting reasonable charges therefor. The fact that a profit resulted would not render the transaction objectionable. The incidental revenue would not characterize the transaction as commercial rather than governmental. . . . The furnishing of the conveniences referred to is a proper incident to the management of the park, and the method followed is so naturally adapted to the desired end that it must be regarded as a matter of administrative detail, not necessary to be specifically authorized by the legislature." (pp. 329-30.)

While there is general accord among the courts that property dedicated for public use can neither be leased, sold nor otherwise diverted to purposes different from those to which it was dedicated, yet the "rule of reason" holds sway on this phase of the law as in all others. Thus in *Codman v. Crocker*, 203 Mass. 146, 25 L. R. A., n. s., 980, the question arose as to the use of the historic Boston Common, a tract of land in the town of Boston which had been set apart by the early colonists as a training ground for the local militia and as a cow pasture for the local inhabitants. For generations the public authorities had endeavored to preserve the famous common to the purposes of its dedication, as nearly as the changing conditions of the changing centuries would permit, yet gradually it became impracticable to use the property as a cow pasture, and, indeed, it became eventually little better adapted as a training ground for the town militia. And so, with the lapse of years, trees were planted on the common, walks were laid out, fountains and monuments erected, and other provisions were made for the comfort and pleasure of the public in their use of the place. With still further changes in the municipal life and customs of the town, the question arose whether the construction of a tunnel under a part of the common would amount to a diversion of the property from

the purposes of its dedication. The court, in effect, answered this question in the negative. In the opinion it was said:

"As years have gone by there is no longer any occasion for common occupation of this land as a cow pasture, and in the sense in which the word 'training field' was then used, this is almost equally true of this other kind of use. The proper execution of the public trust requires that the property be still kept open as a common for occupation by all the people, in ways that are kindred to those in which a common would ordinarily be used under such a dedication in the early years of the colony. . . . Under the changed conditions in recent years, it was held by this court that the construction of a subway through the common was not inconsistent with the purposes of the original dedication, and that it could be authorized by the legislature, acting as the representative of the public interest. (*Prince v. Crocker*, 166 Mass. 347.) This was virtually a decision that such a use was not a violation of the quasi trust under which the legal title is held. It does not disregard the doctrine relied on by the plaintiffs, that where property is dedicated by donors to a public use for a particular puspose, it cannot, at least without the exercise of the paramount right of eminent domain, be appropriated to a use of a different character, in disregard of the trust under which it is held and in violation of the rights of the donors and their legal representatives. . . . In accordance with this doctrine, . . . the common cannot be cut up into building lots and used for the erection of shops, and it may be doubtful whether it could be taken under an act of the legislature and a vote of the city government of Boston, or of the citizens of Boston, and used by a railroad corporation for a freight yard . . . The ground on which the decision stands is that the new use is not at variance with the general purpose of the donors, and that accordingly it was within the power of the authorities, representing the public as beneficiaries under the trust, to provide for this additional use of the property." (*Codman v. Crocker*, 203 Mass. 146, 149, 151; and see notes to same in 25 L. R. A., n. s., 980, *et seq.*)

A case somewhat analogous to the one at bar arose in the city of Hannibal, Mo. One Glascock had platted and dedicated a strip of land as a public levee and landing place for river craft along the bank of the Mississippi in Hannibal. At the time of the dedication and ever since there has actually existed *some* river traffic at Hannibal so as to call for some actual use of the public levee, although through want of maintenance and repairs that use had become negligible. The supreme court of Missouri held that there might be another lawful use of the property consistent with and which tended to promote the use of the property as originally dedicated, *i. e.*, by the construction of railroad tracks, grading, paving and extending the streets, constructing crossings, reconstructing a boathouse and enlarging the facilities for landing boats, and that the granting of

a franchise to a railway company to lay its tracks on the levee in consideration of its undertaking to make such improvements was not illegal. The case received exhaustive treatment, but we can only take space to quote one section of the syllabus, which, however, contains the gist of the decision:

"The owner of land along the Mississippi river in 1836 platted it, and on the plat marked and designated a certain part as a 'public levee' and a 'public landing,' and the plat was recorded, and thereafter that part was used and is still used as a public landing for steamboats, and the city granted to the railroad company the right to construct a double-track railroad through the center and the full length thereof, and spur tracks, but required it to grade and pave the levee a distance of 750 feet, and to extend the streets and to provide safe, well-constructed and convenient crossings over the track, and to reconstruct the boathouse so as to afford enlarged facilities for the landing of boats, and if the improvements are carried out the city for the first time will have a properly improved levee adapted to river traffic, and boats may conveniently and safely anchor at any time, at either low or high water, whereas heretofore they could land only at low water. . . . It is not permitted to use the tracks for car yards, or for switching, but only for passage, and its use of the levee and the rights of the public are safeguarded. The only objection to the railroad use is that it will increase the danger to life and limb of those using the river traffic. *Held*, that the railroad use of the levee is and must ever be subsidiary and subservient to the use of the levee for river traffic, but it is not an inconsistent use, nor a diversion of the trust, and the ordinances were not void or voidable." (*State, ex rel., v. Dryer*, 229 Mo. 201, 202, syl. ¶ 4.)

The learned Missouri court referred to an Oregon case in which a secondary use of a public levee was involved:

"In *R. R. Co. v. City of Portland*, 14 Ore. 188, the public landing had been dedicated to public use by Coffin, the original patentee of the land. Afterwards the legislature granted the railroad the right to occupy the same with track, sidetrack and depot buildings, etc., provided the company should never charge any dockage to any boat, ship or vessel engaged in receiving or discharging cargoes at the wharf. The decision settled the right of the city and railroad. While the dedication was held irrevocable even by the legislature, it was ruled that the placing of railroad tracks and a depot with wharfs and warehouses for the receipt and storage of freight was not destructive of the use, but added to its efficiency, and that the act of the legislature, in so far as it authorized a sale of the landing as such, exceeded their constitutional powers, but that the license to construct the track and depot did not exceed the legislative power and the act was not wholly void." (*State, ex rel., v. Dreyer*, supra, p. 238.)

In the lengthy but interesting case of *Newport, &c., v. Taylor's Ex'rs*, 55 Ky. (16 B. Mon.) 699, 804, it was held, among other matters, that the dedication of lands laid out in a town on the bank of a navigable river to be a *common* confers the right on the public au-

Dellinger v. Soldiers' Compensation Board.

thorities of the town to build wharfs and charge wharfage. See, also, *Goode v. The City of St. Louis*, 113 Mo. 257. ·

In view of the outstanding facts of this case—that the strip of land dedicated for a public levee has not been so used for half a century; that its platted limits have grown by accretion to many times its original proportions (a fact which the dedicators could scarcely have had in contemplation); that the property and its accretion serve no present useful purpose; that the proposed improvements to be effected by the lessee and licensee will in the opinion of the city government responsible for the public welfare accomplish the important desideratum of improving the sightliness and sanitation of the premises, and tend to induce and promote the use of the property as a public levee—this court is bound to hold that no case of abuse of municipal power or diversion of trust property to uses antagonistic to or inconsistent with the purposes contemplated by its dedication is made to appear, nor any case justifying judicial interference with this particular exercise of the administrative discretion vested in the city government.

The judgment of the district court is therefore affirmed.