No. 32,205

The State of Kansas, ex rel. Roland Boynton, Attorney-general, *Plaintiff*, v. The City of Kansas City, Don C. McCombs, as Mayor (Commissioner), F. LeRoy Cooke, H. F. Schaible and George T. Darby, as Commissioners, etc., *Defendants*.

(37 P. 2d 18)

Opinion filed November 3, 1934.

*Roland Boynton*, attorney-general, *Louis R. Gates* and *P. W. Croker*, both of Kansas City, for the plaintiff.

*Alton H. Skinner*, city attorney, *John C. O'Brien* and *Clarence A. Mott*, deputy city attorney, for the defendants.

*William Drennan*, of Kansas City, for the Board of Public Utilities of Kansas City.

*Fred Robertson* and *C. W. Trickett*, both of Kansas City, as *amici curiæ*, on behalf of the state.

The opinion of the court was delivered by

Dawson, J.: In this proceeding the state invokes the original jurisdiction of this court in quo warranto, challenging the authority of Kansas City to enter into a contract with a trustee to be approved by the national government whereby the city lets to the Federal Administrator of Public Works a part of its undeveloped municipal

wharf for $10 per annum and in turn leases from such trustee the same property at a stipulated annual rental of "not less than $25,000 per annum" for an indefinite number of years, such rental to begin on the completion of certain improvements to be constructed on the wharf property from the proceeds of a bond issue of $1,354,000 and a prospective government grant of $482,000.

The state charges that the contract and the city ordinances pertaining thereto are illegal, and that the principal statute relied on for the city's assumption of the challenged powers is unconstitutional.

The city and its governing officials answer at length, admitting all the material allegations of the state's petition; but they join issue on its conclusions of law, and seek to justify the contract and the exercise of the challenged powers on the ground that they are authorized by various statutes and particularly chapter 43 of the Special Session Laws of 1933. (R. S. 1933 Supp. 13-1238 *et seq.*)

The tract of land involved in this action was dedicated by the founders of Kansas City in 1857 as a public wharf. It comprises some hundred acres of unimproved land adjacent to the Missouri river north of its confluence with the Kaw. For a more detailed description see *Kansas City v. Wyandotte County,* 117 Kan. 141, 230 Pac. 79. In that case it was held that the city had authority to lease the property to a private corporation for the consideration of its being improved, provided the uses to which the lessee proposed to put it should not be inconsistent with its potential use as a public wharf. That decision was rendered in 1924, and the legislature supplemented it in chapter 115 of the Laws of 1929 (R. S. 1933 Supp. 12-672, 12-673). (The present lawsuit warrants an inference that the enterprising project contemplated in that case has not materialized.)

At the special session of the legislature of 1933 the statute with which we are now chiefly concerned was enacted. The title of chapter 43 reads:

"An act to authorize cities having a population of 115,000 or over to issue and sell its revenue bonds to pay the cost of improving, constructing, reconstructing or repairing public levees, docks, wharves, river terminals, grain elevator terminal docks, and such storage, railroad and all other facilities which will make the publicly owned levee of such city convenient and accessible for use in connection with water transportation on the navigable river or rivers adjoining such public levees, and prescribing the recitals to be incorporated in such revenue bonds."

The broad powers conferred in the text of the act are well summarized in the title, and we take space here to quote only section 2:

"Revenue bonds, as the term is used in this act, are defined to be bonds issued by any such city in this state to be paid exclusively from the revenue produced by the property and facilities improved, constructed, reconstructed, repaired or otherwise improved by the use of the proceeds of said bonds. Such revenue bonds shall not be general obligations of the city, and shall not contain the recitals set forth in section 10-112, Revised Statutes of Kansas for 1923, or any amendment thereof. Such revenue bonds shall, however, contain the following recitals, viz.: Such bonds shall recite the authority under which such revenue bonds are issued, and that they are issued in conformity with the provisions, restrictions and limitations thereof, and that such bonds and the interest thereon are to be paid from the money and revenue received from the fees charged and rental received for the use of the property and facilities improved, constructed, reconstructed, repaired or otherwise improved by the proceeds, in whole or in part, of such revenue bonds when issued and sold." (Laws 1933, Special Session, ch. 43, § 2.)

Other statutes on which the city partly relies to justify the challenged powers, if pertinent to our inquiry, will be noted later in this opinion.

The challenged contract extends to some forty printed pages of the record, but its outstanding features may be thus summarized:

The object of the contract is to obtain a loan and grant of money from the federal government of $1,756,000 to improve the public wharf, construct a mooring dock, raise its elevation, construct new levees, install storm and sanitary sewers, and to construct a grain elevator, an office building, railway sidings and bridges over Jersey creek, whose outlet reaches the Missouri river through this property.

The city agrees to sell and the government agrees to buy bonds of the city in the sum of $1,354,000 bearing 4 per cent interest maturing serially for thirty years, to be issued under authority of chapter 43 of the Laws of 1933, Special Session. (R. S. 1933 Supp. 13-1238 *et seq.*) These bonds are to be special obligations of the city payable, in part, out of the income which, it is anticipated, will be forthcoming from the improved property; but in addition thereto the city binds itself to pay a further financial obligation which will require careful scrutiny as we proceed.

The city also agrees to enter into a trust agreement with the government, naming a trustee to be approved by the latter, who is to receive and account for all the anticipated income derivable from parties using the facilities of the wharf after the completion of the

projected improvement, which revenues shall be devoted to the maintenance and insurance of risks incidental to the conduct of the wharf and to the payment of interest and principal of the "revenue" bond indebtedness. This feature of the contract and its incidents are elaborately specified, and include methods of accounting, provision for sinking funds, security for funds and the like, but most of these are of no present importance. As an inducement to the city to make the contract a tentative promise of a government grant equal to 30 per cent (not exceeding $482,000) of the cost of the labor and materials used in the improvement is offered, conditioned upon complete compliance by the city with the manifold details of the forty-page contract.

Of vital present concern are the following features of the contract:

"Part One

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"2. Amount and method of making loan.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"(g) Security: The bonds shall be special obligations of the borrower payable exclusively from the revenue (including the rental payments to be made by the borrower under the lease provided for in paragraph 3 [b], part one hereof). . .

"(j) Recitals: The bonds shall recite that they were issued under the authority and provisions of chapter 43 of the Laws of Kansas (Special Session 1933), that they were issued in conformity with the provisions, restrictions, and limitations thereof, that said bonds and the interest thereon are to be paid from the money and revenues received from the fees charged and rental collected for the use of the property and facilities improved, constructed, reconstructed, repaired or otherwise improved by the proceeds in whole or in part of such revenue bonds, and that said bonds are not general obligations of said borrower, but are to be paid exclusively from the revenues of the project as herein defined.

"3. Lease and sublease:

"(a) The borrower covenants and agrees that prior to the sale of any bonds to the government it will, in consideration of the loan and of the grant, lease parcel A to the trustee referred to in paragraph 4, part one, for a term which shall commence not later than the day preceding the date of the first purchase of bonds by the government and which shall continue until the day following the day on which all of the bonds and the interest thereon shall have been paid or an amount sufficient to pay the same shall be held by the trustee, at a rental which shall not be in excess of $10 per annum. The lease shall be in form and substance satisfactory to the administrator.

"(b) The borrower covenants and agrees that subsequent to the execution of the lease provided for in subparagraph (a) of this paragraph, and prior to the sale of any bonds to the government, it will sublease parcel A from the trustee for a term which shall commence on the day following the first day

of the term of the lease provided for in the foregoing subparagraph (a) and which shall continue until the day upon which all of the bonds and the interest thereon shall have been paid or an amount sufficient to pay the same shall be held by the trustee, at a rental which shall be not less than $25,000 per annum, such rent to commence to accrue on the date of the completion of the improvements to parcel A. The sublease shall be in form and substance satisfactory to the administrator and shall provide, among other things, that the rental to be paid thereunder shall be paid monthly to the trustee to be placed by it in the receipts fund hereinafter defined and applied as other moneys in the receipts fund are to be applied.

"4. Trust agreement:

. . . . . . . . . . . .

"H. The trust agreement shall provide that the trustee shall have the duty, power and authority to demand, receive and enforce the collection of the rental to be paid by the borrower under the sublease provided for in subparagraph (b) of paragraph 3, part one hereof, and generally to enforce the terms and conditions of such sublease by action, suit or proceeding or otherwise.

. . . . . . . . . . . .

"K. Miscellaneous provisions. The trust agreement shall contain such other and further provisions as the administrator may require or permit. . . .

"5. Leases of portions of parcel B. The borrower shall satisfy the administrator that it has entered into, or it will enter into leases in form and substance satisfactory to the administrator of all or such portions of parcel B as the administrator may require, upon such terms and conditions and at such rentals as the administrator may approve, and shall also satisfy the administrator that such leases, including any lease or leases made to the board of public utilities of the city of Kansas City, Kan., are binding and legal obligations of the lessees in accordance with their respective terms.

. . . . . . . . . . . .

"18. Conditions precedent to the government's obligations: The government shall be under no obligation to pay for any of the bonds or to make any grant:

"(a) . . . If, in the judgment of the administrator, the financial condition of the borrower shall have changed unfavorably in a material degree from its condition as theretofore represented to the government, or the borrower shall have failed to balance its budget satisfactorily or shall have failed to take action reasonably designed to bring the ordinary current expenditures of the borrower within the prudently estimated revenues thereof; . . .

"PART THREE

. . . . . . . . . . . .

"8. Validation. . . . *The borrower further covenants that it will procure* and furnish to the government, as a condition precedent to the government's obligations hereunder *a letter from the governor of the state stating that* if in the judgment of the administrator it may be advisable to enact legislation to empower the borrower to issue the bonds or to remedy any defects, illegalities or irregularities in the proceedings of the borrower relative to the issuance thereof or to validate the same, *said governor will recommend and coöperate in the enactment of such legislation.*" [Italics ours.]

The state's attack on this contract opens with the contention that the statute which authorizes this large issue of revenue bonds (R. S. 1933 Supp. 13-1238 *et seq.*) is unconstitutional for the reason that it violates section 5 of article 12, which reads:

"Provision shall be made by general law for the organization of cities, towns and villages; and their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, shall be so restricted as to prevent the abuse of such power." (Kansas Const., art. 12, § 5.)

This section of the constitution has often been subjected to judicial exposition. (*Wulf v. Kansas City,* 77 Kan. 358, 94 Pac. 207, and citations.) In that case this court quoted with approval an excerpt from the early case of *Hines et al. v. City of Leavenworth et al.,* 3 Kan. 186, where this constitutional provision was under consideration, thus:

"When a law is passed embracing any of the subjects mentioned in the fifth section, it is the duty of the court, when called upon, to determine whether it contains restrictions, and if it does contain them the law must be held to be valid, notwithstanding the members of the court might doubt their sufficiency to prevent abuses. It is a subject wholly under the control of the political departments of the government. Whatever the legislature determines to be a sufficient restriction, if it be a restriction at all, must be final." (p. 204.)

Whatever criticism this statute may be open to, it is not easy to discern where it falls short of constitutional requirements in respect to the requisite restrictions on municipal taxation. There can be no taxation under this statute. Section 4, in part, says:

". . . Such city shall have no right or authority to levy taxes to pay the principal or interest of revenue bonds as defined herein and the provisions of section 10-113 of Revised Statutes of Kansas for 1923 shall not apply to this act."

The amount of bonded debt which may be contracted under the statute is likewise limited. Section 7 reads:

"In no case in which revenue bonds are issued under and by virtue of this act shall any revenue bonds be issued for the improvement of any public levee and improvements thereon, in excess of the actual cost of same."

To make assurance doubly sure that the proposed "revenue" bonds shall never become a charge against the general taxpayers of Kansas City, the statute prescribes that the bonds shall contain a recital to that effect (Sec. 2), and section 3 similarly provides:

"Sec. 3. Said revenue bonds shall not constitute in any case, a general obligation of such city, and said bonds, if and when issued, shall in no wise be taken into consideration or account as a limitation on the power of such city

to issue bonds for any and all other purposes heretofore or hereafter authorized by law, with relation to a limitation upon the bonded indebtedness of said city.

"The governing body of any such city . . . may create a lien on the revenues to be obtained from such property and facilities and pledge the same to the payment of said revenue bonds and interest thereon."

Counsel for the state cite the familiar case of *Loan Association v. Topeka,* 20 Wall. 655, 87 U. S. 655, as authority that a statute which authorizes a city to contract a debt implies a duty on the city to levy taxes to pay such debt, but Mr. Justice Miller's opinion in that case concedes the possibility that a city may have other resources than the power of taxation, out of which the debt may be satisfied. It was there said:

"If these municipal corporations, which are in fact subdivisions of the state, and which for many reasons are vested with quasi legislative powers, have a fund or other property out of which they can pay the debts which they contract, without resort to taxation, it may be within the power of the legislature of the state to authorize them to use it in aid of projects strictly private or personal, but which would, in a secondary manner, contribute to the public good; . . ." (p. 659.)

It seems clear that where the parties debtor and creditor agree that only the anticipated income of the improved wharf and its incidents shall be looked to for the discharge of the debt, such agreement violates no rule of constitutional law.

The early case of *State, ex rel., v. Osawkee Township,* 14 Kan. 418, is also invoked as an authority against the statute. We think it does not control. Indeed the lapse of half a century and changing conceptions of what constitutes a public purpose have greatly narrowed the potency of the Osawkee case. See *Beck v. Shawnee County,* 105 Kan. 325, 182 Pac. 397; *Treadwell v. Beebe,* 107 Kan. 31, 38, 190 Pac. 768. In our time, when legislative, executive and judicial sanction are unreservedly given to projects for the improvement of streets, parks, drainage districts and the like, and to municipal ownership of waterworks, gas works and electric-power plants, it would be out of the question to hold that a city situated on a navigable stream could not be given a valid grant of power by legislative enactment to improve a tract of land dedicated as a site for a public wharf by the founders of that city three-quarters of a century ago. And whether such legislation is wise or otherwise is not a judicial question. In *State v. Mercantile Co.,* 103 Kan. 733, 739, 176 Pac. 321, it was said:

"But legislation may be ill-advised, puerile, or *faux pas* and yet not be unconstitutional."

478

The court holds that the statute contains no material infirmity under the test of section 5 of article 12 of the state constitution.

What about the contract which defendants avow their intention to execute and perform under the claimed sanction of the statute just considered? That statute authorizes the city to embark in an ambitious venture to improve the municipal wharf, and to issue revenue bonds to raise the requisite funds to accomplish that purpose. But neither this statute nor any other to which our attention has been directed authorizes the city to *let* the property to a governmental functionary for $10 per annum and then *sublease* it from that functionary for an indefinite number of years and at a sizeable but indefinite sum of money which is not to be less than $25,000 per annum. Incorporated in defendants' answer is an estimate of anticipated sources of income out of which the city *hopes* to pay off the proposed "revenue" bonded indebtedness in thirty years:

"(1) Commitments for rentals contingent on construction of project:

| | | |
|---|---:|---:|
| U. S. barge-line dock | $9,000.00 | |
| Board of Public Utilities of Kansas City, Kan., | 5,200.00 | |
| Phillips Petroleum Company | 810.00 | |
| Elevator lessee for vacant ground | 432.00 | |
| Union Pacific Railroad Company, track rental | 2,937.60 | |
| | | $18,379.60 |

"(2) Income from trackage:

| | | |
|---|---:|---:|
| 8,000 cars estimated 'in' grain to elevator at $1 per car | $8,000.00 | |
| 6,000 cars estimated 'out' merchandise from barges at $1 per car | 6,000.00 | |
| | | $14,000.00 |

"(3) Rental of footage to various tenants on basis of 60 cents per sq. ft. at 6 per cent:

| | | |
|---|---:|---:|
| Future railroad right of way, 73,600 sq. ft. | $2,649.60 | |
| Kansas Retail Grocers' Association, 50,000 sq. ft. | 1,800.00 | |
| Midland Valley Casket Company, 48,000 sq. ft., | 1,728.00 | |
| Milk Producers' Association, 14,000 sq. ft. | 504.00 | |
| | | $6,681.60 |

"(4) Lease of grain elevator on 30-year lease—
at $40,000.00 for 5 years
50,000.00 for 10 years
55,000.00 for 5 years
60,000.00 for 10 years

| | |
|---|---:|
| Initial annual rental | $40,000.00 |

Total estimated rentals per annum for first five years.. $79,061.20"

This estimate of prospective income is followed by an elaborate schedule of amortization, designed to show that the income will increase from year to year with the result that in thirty years the entire indebtedness will be extinguished and a balance accumulated

of $474,157.50. Although it is none too clear from the contract or defendants' answer, it is fairly deducible from them, considered together, that the annual rental of "not less than $25,000" which the city is to pay will depend upon how nearly the anticipated annual income of $79,061.20 will be derived from the "commitments," fees and rental charges to be collected from users of the wharf and its facilities.

As the contract did not specifically state the sources from which the city is to procure whatever sum of "not less than $25,000 per annum" it binds itself to pay as rent under its tenancy as sublessee of a portion of the improved wharf, the court, after this cause was submitted, invited counsel to present their views on this important feature. Amid the divergent responses of counsel it fairly appears that the annual sum of "not less than $25,000," which the city obligates itself to pay, *is in addition* to the revenues or income derivable from the commitments, trackage, charges, rentals, etc., which the users of the improved wharf are to pay, and which constitute the exclusive fund, under the statute, from which the revenue bonds of the city are to be liquidated. While the statute contemplates that the generality of Kansas City taxpayers shall not be out of pocket one penny on account of this authorized project and authorized bond issue, the contract binds the city to pay an annual sum of not less than $25,000 for an indefinite time—until the revenue bonds are paid, whenever that may happen. And the city can only find the money to pay this annual sum by drafts on its general fund. The general fund is chiefly raised by a general property tax, although counsel for the city assures us that there are odds and ends of this and that—license fees, fines, etc., which aggregate about $150,000—which go to augment the general fund; and by such refinement of argument they contend that the $25,000 per annum, or whatever it turns out to be, will not become a burden on the general body of taxpayers. We cannot assent to that. The taxpayers must contribute to the creation and maintenance of the general fund, and whatever is paid out from that fund must necessarily result in further contributions thereto by the generality of taxpayers. Now this annual sum of $25,000 per annum or more, which the city agrees to pay, is to be handed over through a prescribed system of bookkeeping into the hands of the trustee, and devoted, like the wharf revenues, to the payment of the proposed bonded indebtedness of $1,354.000. So whether this unusual scheme of letting the city's

wharf property for $10 per annum to a trustee and subleasing it from the trustee for the stipulated rental of "not less than $25,000 per annum" was designed as an evasion of the clear and positive mandate of the statute that the bonds shall be paid from wharf income and not otherwise, the contract, as drawn, has that effect.

If that conclusion were not sufficient to demolish this contract, there is a provision of the constitution which forbids the payment of so considerable a sum as $25,000 per annum without a specific statute authorizing a tax to raise the money. Section 5 (old § 4) of article 11 provides:

"No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same; to which object only such tax shall be applied."

In interpreting this provision this court has said that miscellaneous inconsequential expenses of a county or city may be paid out of the general fund without requiring the imposition of an authorized special tax; but where the amounts to be disbursed are so large as to materially affect the revenues of the municipality they must be raised by specific levies pursuant to specific statutory authority, and may not otherwise be lawfully paid out. (*State, ex rel., v. Thomas County Comm'rs*, 122 Kan. 850, 253 Pac. 406.) The rule applied in that case has been strengthened by the enactment of the budget law of 1933 (R. S. 1933 Supp. 79-2925 *et seq.*), and, in our opinion, the constitutional and statutory infirmities of the challenged contract are insurmountable.

The conclusion just reached dispenses with the necessity of dealing in detail with other matters urged by counsel in support of and against the contract. Of course the city could lease the wharf or a portion of it to a tenant, and, of course, if the city had no wharf it might acquire one by lease or otherwise; but the scheme to let the wharf the city already owns for a nominal sum and then take back a sublease thereof for a large but uncertain amount for an uncertain length of time has no statutory sanction. Counsel for the city expatiate at length on the economic advantages which may accrue to the city and state if the proposed contract should pass the test of constitutional and statutory sanction. That, however, posits a field of disputation which a judicial tribunal is not authorized to decide. And whether the city may authorize its light and power department to pay $5,200 per annum for the use of a portion of the improved wharf is a serious question, but one not now necessary to be decided. The court has not overlooked those features of the

contract which are susceptible of an interpretation that the governing body of Kansas City agrees to abdicate, in part, the discretionary powers vested in it for the welfare of the municipality, and agrees in advance to be guided and directed in vital matters of public concern by a representative of the national government. Such a policy, if given judicial countenance, will be a considerable departure from the policy of home rule, which has hitherto been regarded as a *sine qua non* of Kansas municipal government.

The court acknowledges the assistance it has received from counsel for all the litigants and by *amici curiæ* in the solution of the legal questions here presented; and without misgiving we have reached the conclusion that the contract which defendants propose to make in behalf of Kansas City with the federal emergency administrator of public works is illegal; and judgment will therefore be entered against the city and its governing officials, ousting them from the exercise of the challenged powers and from executing or complying with the proposed contract.

Judgment is for plaintiff.