JONES, APPELLANT, *v.* COONEY ET AL., RESPONDENTS.

(No. 6,270.)

(Submitted January 14, 1928. Decided January 21, 1928.)

[263 Pac. 429.]

*Counties—Paupers—Care of Indigent Sick, Poor and Infirm— Powers of Board of County Commissioners—Constitution— Statutory Construction.*

Counties—Paupers—Constitutional Provision to Receive Broad Construction.
    1. *Held,* that the provision of the Constitution (Art. X, sec. 5) that the counties of the state shall provide by law for those inhabitants who, by reason of age, infirmity or misfortune, may have claims upon the sympathy and aid of society, must be given a broad construction consistently with its benevolent purpose.

Same—Care of Indigent Sick, Poor and Infirm—Statutes—Wide Discretion in Board of Commissioners.
    2. *Held,* that in enacting section 4521 et seq., Revised Codes 1921, relative to the care by counties of their indigent sick, poor and infirm, the policy of the legislature has been to impose a wide discretion in the county commissioners and that, in carrying out such policy, their power is not limited to placing the poor in the county poorhouse, where there is one, or to contract for their maintenance, but may, if they deem it proper, extend aid in the shape of fuel, groceries, clothing or by small doles of money, at their respective places of residence.

Same—County Auditor Superintendent of Poor Under Rules and Regulations Prescribed by County Commissioners.
    3. While under section 4833, Revised Codes 1921, the county auditor is made the superintendent of the poor who must care for and examine all claims that may be made upon the county for charity, he must do so under such rules and regulations as the commissioners may prescribe in their discretion.

---

[1–3] Paupers, 30 Cyc., p. 1067, n. 24 New, p. 1070, n. 62, p. 1071, n. 65, 66, p. 1147, n. 42 New.

*Appeal from District Court, Lewis and Clark County; W. H. Poorman, Judge.*

ACTION by Francis D. Jones, as a taxpayer of Lewis and Clark County, against T. J. Cooney and others, as members and constituting the Board of County Commissioners of Lewis and Clark County. Judgment for defendants and plaintiff appeals. Affirmed.

*Mr. E. G. Toomey* and *Sam D. Goza, Jr.,* for Appellant, submitted a brief; *Mr. Toomey* argued the cause orally.

*Mr. Geo. W. Padbury,* County Attorney, and *Mr. A. P. Heywood,* Assistant County Attorney, for Respondents, submitted a brief; *Mr. Heywood* argued the cause orally.

*Mr. M. P. Costello, Amicus Curiae,* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an action brought by the plaintiff, who is a resident, citizen and taxpayer of Lewis and Clark county, against the board of county commissioners of that county, and the defendants, who constitute the board. In his complaint the plaintiff alleges that the defendants are paying out and dispensing public money for the care and maintenance of the poor of Lewis and Clark county in a manner and for a purpose not authorized by law, asking that a restraining order be issued prohibiting them from so doing. The court sustained a demurrer to the complaint and directed that the action be dismissed, upon which order judgment was entered, from which the plaintiff has appealed.

The facts, admitted by the demurrer, are that Lewis and [1–3] Clark county owns and conducts a county poor-farm with suitable buildings to care for about 100 sick, poor and infirm male or female adults. The poorhouse or poor-farm is

supervised by a superintendent working under the directions of the board of county commissioners; sixty-five adults are cared for at the poorhouse, although there is room for approximately ten additional adult females and twenty additional adult males. There are no accommodations at the place for children and it seems unwise from the standpoint of morals, environment and education to commit minor children to the poor-farm; at least that is the settled policy of the county commissioners, against which criticism has not been directed. There are in the county more than 100 male and female adults and minors applying for and entitled to relief under the head of persons who are indigent, sick and infirm, over and above the number that may be accommodated at the poor-farm when it is filled to capacity. To these persons the board has been granting aid in the shape of fuel, groceries, clothing, and in some cases when required small doles of money, at their respective places of residence in the county, without committing or attempting to commit such persons to the poor-farm. The commissioners of Lewis and Clark county have been following this course for many years.

Illustrative cases are: (1) An aged man residing in a cabin on the Rocky Mountain divide near Austin who is unable to perform manual labor requisite to a livelihood, he being without relatives, property or income. (2) A woman with three children of tender years who require the presence at home of their mother, the woman being without property, income or relatives; and unless food, fuel and clothing is furnished to the woman and her children, each and all of them will become destitute. (3) A man and woman with five minor children, residing in the Helena valley, the husband being sick and infirm, three of the children being now ill with typhoid fever; the family being without income or means of livelihood, or the most rudimentary provisions for relief, warmth and life, and unless aid is furnished by the county or some charitable institution the family will become destitute. (4) A woman and four children residing in the sixth ward of the city of

Helena, the woman's husband being at the present time confined to the county hospital of Lewis and Clark county, heretofore having been confined in the state hospital for the insane at Warm Springs. The family has no relatives except as stated, and unless food, clothing and fuel is furnished they will be in danger of starvation and death.

Each and all of these persons are bona fide residents of Lewis and Clark county, and the commissioners claim that these indigent persons, and others similarly situated, can be maintained and cared for as public charges at their respective places of abode for one-half the cost and expense which would be incurred by maintaining and caring for them at the county poor-farm or hospital.

It is alleged that in addition to the persons named, 'the defendants are granting, allowing and furnishing to, and will, unless restrained by the court, continue to grant, allow and furnish food, clothing and fuel at the expense of the poor fund, to more than 100 male and female adults and minors in Lewis and Clark county, over and above the number that may be accommodated at said county poor-farm or hospital, or the number of persons entitled to and receiving old age pensions from said county under the provisions of the Old Age Pension Act. The plaintiff alleges that whatever may be the wisdom of the method pursued by the commissioners, the statutes of the state provide the sole grant or authority to those officers and the statutes require that the poor of Lewis and Clark county be confined at the poorhouse and when that is filled to capacity, no further or other aid can be extended out of the poor fund.

The care of the state for its dependent classes is considered by all enlightened people as a measure of its civilization (21 R. C. L. 701), and provision for the proper care and treatment at public expense of the indigent sick, and of those who for other reasons are unable to take care of themselves is said to be among the unquestioned objects of public duty. (*State*

*ex rel. Griffith* v. *Osawkee Township,* 14 Kan. 418, 19 Am. Rep. 99; 20 Cal. Jur. 880.)

The people of Montana gave recognition to this high moral obligation when they wrote into our Constitution section 5 of Article X, which provides: ''The several counties of the state shall provide as may be prescribed by law for those inhabitants, who, by reason of age, infirmity or misfortune, may have claims upon the sympathy and aid of society.'' As this constitutional declaration is not self-executing the measure of relief which may be furnished necessarily depends upon statutes enacted to carry out the benevolent purpose expressed.

As will appear presently, the statutes upon the subject are not in complete harmony, but we think the legislative intention may be found with reasonable certainty.

The First Legislative Assembly passed an Act relating to the support of the poor. (Bannack Laws, p. 457.) The first section of the Act vested the county commissioners of the several counties ''with entire and exclusive superintendence of the poor,'' and without material alteration that declaration has been carried forward continuously to the present time; it now appears as section 4521, Revised Codes 1921. Section 2 of the Bannack Act has likewise been carried forward substantially. It now appears as section 4522, Revised Codes 1921, and provides, *inter alia,* that every person without means, who is unable to earn a livelihood in consequence of bodily infirmity, idiocy, lunacy or other cause, must be supported by designated relatives, ''if they, or either of them, be of sufficient ability, in the order named.'' In 1876 an addition was made,—provided the indigent person had not come to his deplorable state from intemperance or other vice. (Laws Mont. 1876, p. 52.) This proviso has been continued and appears as section 4523, Revised Codes 1921.

Another provision of the Bannack Act, section 4, was the forerunner of section 4524, Revised Codes 1921, which reads: ''When such person does not have the relatives mentioned in section 4522 of this Code, in any county, or such relatives are

not able, or fail or refuse to maintain such person, then he must receive relief from the county as hereinafter provided."

The latter part of section 4 of the Bannack Act provided that the "county commissioners may either make a contract for the necessary maintenance of the poor, or appoint such agents as they may deem necessary to oversee and provide for the same."

Section 10 of the Bannack Act gave the county commissioners authority to cause to be built or provided in their counties, "workhouses for the accommodation and employment of such paupers as may from time to time become a county charge." The workhouse scheme seems to trace back to the days of Edward the Sixth. (1 Blackstone's Commentaries, star pp. 359–363.)

Section 14 of the 1876 Act authorized the county commissioners to purchase, improve and keep in repair a tract of land not exceeding 160 acres, to be known as a poor-farm, and to erect thereon suitable workhouses for the use, health and employment of such person or persons as are, or who may become, from time to time, a county charge, and provided that the poor-farm, "together with such paupers as may become a county charge, shall be under such rules and regulations as the county commissioners shall deem just and proper." The commissioners were also authorized "if in their judgment they deem it best" to provide for the care, support and maintenance of the sick, poor and infirm of the respective counties upon such poor-farm.

Section 14 was carried forward into the Revised Statutes of 1879 as section 968, page 607, into the Compiled Statutes of 1887 as section 1622, page 1090, and substantially into the Political Code of 1895 as section 3213, since which time it has come down to us without material change, the section now being 4534, Revised Codes 1921, and reading as follows: "The board may purchase, improve, and keep in repair a tract of land not exceeding one hundred and sixty acres, to be known as a poor farm, and to erect thereon suitable workhouses for

the use, health, and employment of all persons who are a county charge, and the poor farm, with the workhouses and the persons who are a county charge, must be under such rules and regulations as the board orders. It may also provide for the care, support, and maintenance of the sick, poor, and infirm of the county upon the poor farm."

The policy of the legislature, as disclosed by the enactments referred to, has been to repose discretion in the commissioners, respecting the care of the sick, poor and infirm. Nowhere do we find any positive direction respecting that matter. With respect to those who come within the category of "sick, poor and infirm" nothing need be added to what was said by Mr. Justice DeWitt in *Lebcher* v. *Commissioners of Custer County*, 9 Mont. 315, 23 Pac. 713.

The Codes of 1895 prescribed the general powers and duties of county commissioners. Section 4465, Revised Codes 1921, as amended (Session Laws 1923, Chap. 95), is a re-enactment of the 1895 Act so far as it relates to the matter directly in hand. It provides that the board of county commissioners "has jurisdiction and power under such limitations and restrictions as are prescribed by law: * * * 5. To provide for the care and maintenance of the indigent sick or the otherwise dependent poor of the county; erect and maintain hospitals therefor, or otherwise provide for the same * * * ." The general language employed is noteworthy.

Beginning with 1876 the county commissioners were required at their regular session in September of each year to invite proposals for the care, support and maintenance of the sick, poor and infirm of the county, per capita, by the week, "the proposals to include and cover the entire cost of feeding, clothing and nursing of the said sick, poor and infirm and all burial expenses thereof." (Sec. 5, Laws Mont. 1876, p. 52.) That section has been continued substantially and now appears as 4525, Revised Codes 1921.

Section 6 of the 1876 Act required the proposals mentioned in section 5 to be addressed to the clerk of the board of county

commissioners and required the commissioners to award a contract to the lowest responsible bidder for the ensuing year. (Laws Mont. 1876, p. 53.) Section 6 was continued, in substance, until 1911, when this was added thereto: "Provided, however, that in a county owning a county poor farm with suitable buildings of sufficient size to care for the indigent sick, poor and infirm of such county, the county commissioners of such county may employ some suitable person as superintendent of such poor farm, and the county may maintain the said indigent poor, sick and infirm at said farm at the expense of such county. Such superintendent shall at all times be under the control and subject to the orders of the board of county commissioners, and may be removed by them at any time." (Sess. Laws 1911, Chap. 45, p. 78.) The section as amended is now 4526, Revised Codes 1921.

It will be observed that sections 4525 and 4526 provide two methods of taking care of the indigent sick, poor and infirm of the county; one by the contract method (at the poor-farm or otherwise), and the other under the superintendence of the county commissioners, the latter method being permissible in a county "owning a county poor farm with suitable buildings of sufficient size to care for the indigent sick, poor and infirm of such county." In that case it is provided that "the county may maintain said indigent sick, poor and infirm at said farm at the expense of such county." There is not any provision empowering the commissioners to employ both methods at the same time. We think a rational construction of these two statutes compels the conclusion that the county must employ one method or the other and not both at the same time.

Another statute requires consideration. In 1891 the legislature created the office of county auditor for certain counties. Section 10 of the Act provided: "The county auditor hereby created is also made county superintendent of the poor, whose duty it shall be, under such rules and regulations as may be prescribed by the county commissioners, to care for and examine all claims that may be made upon the county for charity; also to have, under the direction of the county commissioners,

general supervision of the county poor house or farm." This section has been continued ever since its enactment and is now section 4833, Revised Codes 1921.

By the provisions of Chapter 117, passed by the Eighteenth Legislative Assembly (Sess. Laws 1923, p. 289), a county auditor shall exist in all counties of the state of Montana of the first, second, third and fourth classes. Lewis and Clark county is a county of the fourth class. By the enactment of section 10 of the County Auditor Act, now section 4833, supra, the legislature recognized expressly what had been implied before: that there are two classes of unfortunate people to whom the county commissioners may extend aid; one of the classes generally designated as paupers, ordinarily cared for by commitment to the poor-farm, or by a contractor, and the other consisting of those who in the judgment of the commissioners should receive charitable aid. While the language of section 4833, supra, makes the auditor the "superintendent of the poor" and prescribes that it shall be his duty, "under such rules and regulations as may be prescribed by the county commissioners, to care for and examine all claims that may be made upon the county for charity," it is plain that supervisory and regulatory powers in the matter are reposed in the commissioners; they are given a wide latitude with respect to the rules and regulations authorized by the statute.

It will be seen that none of the Acts above referred to has contained therein a mandate requiring the county commissioners to commit any certain person or persons to the poor-farm. The language is permissive rather than mandatory. Nor in any enactment with respect to the letting of contracts is there any inhibition against the commissioners' affording relief to those who may not come within the terms of the contract; to this phase of the case we need not give any further attention for the reason that it is admitted that the Lewis and Clark county commissioners are not pursuing the contract system.

The provisions of the Constitution must be given a broad construction consistently with its benevolent purpose. It can-

not be admitted, in view of the tenor of its language, that
public charity may be extended only to those unfortunates who
are characterized generally as paupers. This statement is
given support by *State ex rel. Cryderman* v. *Wienrich,* 54 Mont.
390, 170 Pac. 942, wherein Mr. Justice Sanner said, arguendo,
that there cannot be a doubt that under this section of. the
Constitution "a family burned out of house and home, or
by an epidemic isolated there, without money, credit or other
means of support, would be persons for whom a county should
provide."

When the character of the legislation enacted by territory
and state with relation to the care of the poor is considered and
analyzed as a whole one is led inevitably to the conclusion that
it has been and is the policy of the law-making body to repose
in the county commissioners a wide discretion in the care of
the indigent poor, sick and infirm of their respective counties.

There cannot be any doubt that the county commissioners
have the authority, in the exercise of a sound discretion, to
extend aid to the families described in illustrative cases 2, 3
and 4. The periods of time during which county aid may be
extended to these people may be but temporary. Moreover, it
must not be forgotten that no provision has been made for
the care of children at the poor-farm of Lewis and Clark
county. A man would possess some temerity who would com-
plain because of that. Since 1895 the legislature has omitted
to make special reference to the care of children in statutes
relating to the care of the poor. (But see sec. 1140, Rev.
Codes 1921.)

Illustrative case No. 1 rests upon a somewhat different foot-
ing, but we think the constitutional and legislative policy
embraces that case also. Many instances may be cited where
people who have been useful citizens, through sickness, mis-
fortune, advancing years, or a combination of these, have be-
come, and without their own fault, unable to earn a livelihood
by reason of bodily infirmities. Being without relatives, prop-
erty or income they are proper objects of public charity. A

man of this character may be able to care for himself in his humble abode if he is provided with the ordinary necessaries of life. If he thus cares for himself, in a measure he relieves the county of a portion of the burden which it would be compelled to assume if he became an inmate of the poor-farm.

Another element, but not a legal one, now enters upon our consideration; it is worthy of mention at least, even if it rests upon human frailty alone. In the minds of some it is erroneously assumed that being committed to the poor-farm carries with it some stigma of disgrace; and many indigent persons prefer to retain what they term their self-respect and independence by remaining in their own homes, however inadequate these homes may be to their comfort. It is admitted that the county can maintain such persons, who otherwise would be committed to the poor-farm, at one-half of what it would cost to maintain them on the poor-farm.

It is also admitted that the county commissioners of Lewis and Clark county for many years have been caring for the indigent poor, sick and infirm by committing some to the poor-farm, and extending relief of the character mentioned in the complaint to others who reside at their respective homes and there care for themselves. It is a matter of common knowledge that that policy has been pursued in a large number of the counties of the state from the earliest days. The fact that the county authorities throughout the state have followed this practice, upon the assumption that it was lawful, for so many years, is entitled to some consideration.

It may be true that the commissioners of Lewis and Clark county have been disregarding the authority of the auditor by going over the head of that officer in extending public charity, but no complaint is made upon that score and the point is not directly involved in this proceeding.

The judgment of the district court is right, and it is affirmed.

*Affirmed.*

ASSOCIATE JUSTICES MYERS, STARK, MATTHEWS and GALEN concur.