**KANSAS GAS & ELECTRIC CO. v. CITY OF INDEPENDENCE, KAN., et al.** *
No. 1202.

Circuit Court of Appeals, Tenth Circuit.
Aug. 20, 1935.

*Rehearing denied 79 F.(2d) 638.

Blatchford Downing, of Kansas City, Mo. (McCune, Caldwell & Downing, of Kansas City, Mo., and Thos. E. Wagstaff and Wagstaff & Scovel, all of Independence, Kan., on the brief), for appellant.

Chester Stevens, of Independence, Kan. (Theo. F. Varner, of Topeka, Kan., on the brief), for appellees.

Henry T. Hunt, Sp. Asst. to Atty. Gen., as amicus curiæ.

Before LEWIS, PHILLIPS, and Mc-DERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

This is a suit brought by the Kansas Gas and Electric Company (hereinafter called the Electric Company), against Independence, Kansas, a city of the second class (hereinafter called the City), and Ralph C. Mitchell, W. C. Cavert and Frank E. Stoops as Board of Commissioners and Governing Body of the City, and G. H. Krienhagen as clerk of the City.

The facts alleged in the bill, pertinent to the questions here considered, are these: The Electric Company is a corporation organized under the laws of West Virginia, and is authorized by its charter to engage in the business of generating, transmitting, and furnishing electric energy for light, heat, and power as a public utility. It is authorized to transact such business in the State of Kansas, and its principal office in that State is at the City of Wichita.

It has a non-exclusive franchise from the City to engage in transmitting and furnishing electricity to the City and its inhabitants, and to occupy the streets of the City for that purpose.

The Electric Company has been furnishing electric energy to the City, at a profit, for lighting and power purposes. It receives a gross annual revenue therefrom of $12,000, and the value of such business is in excess of $3,000. The requisite diversity of citizenship exists.

The Electric Company is the only producer and distributor of electric energy in the vicinity of the City, and has expended large sums to provide facilities to generate electric energy, transmit it to the City and furnish it to the City and its inhabitants. Its service has been adequate and satisfactory.

The governing body of the City adopted resolutions by which it proposed "to construct, alter, repair, improve, extend and enlarge the municipal waterworks plant of said City" by contracting for and installing "two 280 H. P. Diesel Engines * * * two 233 K. V. A. generators" and a distributing system consisting of "transformers, power lines," and other equipment to generate and transmit electric energy for light and power purposes at the waterworks plant, sewage disposal plant, city park, Memorial Hall, white-way street lights, cemetery, and other City instrumentalities, and one 1000 G. P. M. and two 2000 G. P. M. motor driven centrifugal pumps at the waterworks plant, and to issue revenue bonds to provide funds to pay therefor in accordance with chapter 32, Kansas Special Session Laws 1933.

The governing body of the City published a notice to the qualified electors of the City of its intention to contract for and install such generating plant, distributing system and pumps, and to issue such revenue bonds to pay the cost thereof.

The notice stated that a written protest signed by ten per cent of such electors might be filed within fifteen days after publication of the notice, and if such a protest should be filed, the governing body of the City would submit such proposed project and bond issue to the electors of the City at the regular election to be held April 3, 1934. Such a protest was filed within the specified time. The project and bond issue was submitted at the election and carried by less than a two-thirds vote.

To obtain funds to construct such project the City made application to the Federal Emergency Administration of Public Works for $60,000, seventy per cent thereof to be a loan and thirty per cent a grant. The application was pending when the bill was filed.

The City will divert and use in paying the cost of such proposed project all revenue heretofore accumulated and hereafter

to be received from the operation of the City waterworks.

The sewage disposal plant, city park, City Hall, Memorial Hall, and white-way lights are not revenue producing.

Approximately 3.83 miles of power transmission lines, necessary supports therefor, transformers, switches and other equipment would have to be acquired to carry the electric energy from the point of generation to the several City instrumentalities to be provided therewith. Such transmission lines, supports, transformers, switches and other equipment would cost not less than $17,000.

The bill prayed that the defendants be enjoined from proceeding further with the proposed project; from entering into any contracts or incurring any obligations for the purchase, construction or installation of any electric generating machinery, pumps, motors, or other appliances at the waterworks plant, and any electric power or transmission lines, supports, transformers or appliances outside the waterworks plant; and from issuing revenue bonds, and from diverting funds heretofore or hereafter to be received from the operation of the waterworks to pay the cost thereof.

On December 11, 1934, the Electric Company filed an application for leave to file a supplemental bill. In the supplemental bill the Electric Company alleged these facts: That the application of the City for a loan and grant had been approved; that thereafter the City decided not to sell its bonds to the United States, but to others, and amended its application so as to request a grant only; that on October 2, 1934, the Public Works Administrator approved the application for a grant of $18,500; and that the Electric Company is a federal taxpayer.

It further alleged that such grant would be for a local and a private purpose and not a general or public purpose, and would not be a part of a comprehensive program of public works; that if such proposed project was carried out it would destroy the Electric Company's business in the City and result in unemployment instead of an increase in employment; that the grant would be contrary to the Constitution of the United States; that Title 2 of the National Industrial Recovery Act unconstitutionally delegates legislative power to the President; that the Public Works Administrator had announced, adopted and put into force a policy of granting or withholding funds to cities to construct competing utilities, dependent upon whether the existing utility would reduce rates and adopt rules and regulations in accordance with the view of such Administrator; and that the grant would constitute an invasion of and interference with the sovereign power of the State of Kansas.

It prayed that the defendants be enjoined from prosecuting their application for, and from accepting and receiving any grant of federal funds, and from using any such funds, if received, in carrying out such project.

The trial court denied leave to file the supplemental bill and dismissed the original bill.

In considering the questions presented we assume, as we must, the truth of the matters well pleaded in the bill and supplemental bill.

Four primary questions are presented: (1) Is the proposed bond issue valid, (2) has the Congress power under the Constitution to authorize the grant, (3) does Title 2 of the National Industrial Recovery Act unconstitutionally delegate legislative power, and (4) may the Electric Company challenge the validity of the bond issue and the grant?

█ I. The franchise of the Electric Company is non-exclusive. The City is not obligated by any contract to continue to purchase electric energy from the Electric Company. The City is authorized to construct and operate its own electric light and power plant, and to supply electric energy to itself and its inhabitants, under the provisions of 12—842, R.S.K., 1923.

It follows that the City has the legal right to construct an electric generating plant and a distributing system, and to provide electric energy for its own purposes in competition with the Electric Company.[1]

*Is the proposed bond issue illegal?*

█ Section 2, c. 32, supra, provides that "any municipality, authorized by the laws

1 Knoxville Water Co. v. Knoxville, 200 U. S. 22, 26 S. Ct. 224, 50 L. Ed. 353; City of Joplin v. Southwest Missouri Light Co., 191 U. S. 150, 156, 24 S. Ct. 43, 48 L. Ed. 127; Helena Water Works Co. v. Helena, 195 U. S. 383, 392, 25 S. Ct. 40, 49 L. Ed. 245.

of the state of Kansas to issue general obligation bonds for the construction, reconstruction, alteration, repair, improvement, extension or enlargement of any utility, is hereby empowered to issue and sell revenue bonds in payment of the cost of such utility."

Section 8 thereof provides that "the governing body * * * of any municipality, by a two-thirds vote * * * may contract for or make *repairs, extensions or improvements* of any of its present existing utilities, and issue revenue bonds in payment of the cost thereof," but that in the event of a protest after notice as provided in such section, the governing body "shall thereupon submit such proposed project and the proposed bond issue to the electors of such municipality," and "in the event a majority of such electors voting on such proposition at such election shall vote in favor thereof, such repairs, extensions or improvements shall be made and such bonds may be issued in payment" thereof. (Italics ours.)

Section 10 thereof provides that "all bonds issued and sold pursuant to the provisions hereof shall first be authorized by a two-thirds vote at an election as now provided by law for issuance of general obligation bonds of the municipality."

Section 8 provides for the authorization and issuance of bonds to pay the cost of repairs, extensions, or improvements of an existing utility. In the event of a protest the proposed project and bond issue must be approved by a majority vote of the electors voting on the proposition.

Section 10 provides for the authorization and issuance of bonds to pay the cost of the construction of a new utility, or the reconstruction of an old utility. Such bonds must be authorized by a two-thirds vote of the electors voting thereon.

The resolutions provided for the purchase and installation of a generating plant and a distributing system to generate and transmit electric energy for light and power for the city waterworks, sewage disposal plant, City Hall, Memorial Hall, city park, white-way street lights and cemetery, and other City instrumentalities, and for the purchase and installation of motors and pumps at the waterworks plant.

The proposed electric generating plant and the transmission system, which were specifically described in the resolution and notice as two 280 H. P. Diesel engines, two 233 K. V. A. generators, transformers, and power lines to all electric consuming instrumentalities of the City, would not constitute mere repairs, extensions or improvements of the waterworks plant, but would be the creation of a new electric utility to generate and transmit electric energy for all City purposes.

A generating plant at the waterworks and the pumps to be there installed might constitute an extension or improvement of the waterworks, but the proposed project was more than that; it was to be an electric generating plant and a distributing system to generate and transmit electric energy for all City purposes. Nor can we separate the good from the bad. One project not two were submitted. The voters passed upon it as a single or integral project, and not as two projects.

It follows that bonds could only be issued to pay the cost thereof after they had been "authorized by a two-thirds vote at an election as now provided by law for issuance of general obligation bonds of the" City.

We conclude therefore that the proposed bond issue, not having been authorized by a two-thirds vote of the electors, is illegal.

*May the Electric Company challenge the validity of such proposed bond issue and such diversion of funds in this proceeding?*

The Electric Company has a franchise from the City under which it is furnishing electric energy for light and power to the City and its inhabitants. Such franchise is a contract and constitutes a property right. Frost v. Corporation Commission of Oklahoma, 278 U. S. 515, 519, 520, 49 S. Ct. 235, 73 L. Ed. 483; City of Campbell v. Arkansas-Missouri Power Co. (C. C. A. 8) 55 F.(2d) 560, 562.

True, it is not an exclusive franchise. Nevertheless it entitles the Electric Company to protection against the City's undertaking to enter into competition with it through unlawful means. City of Campbell v. Arkansas-Missouri Power Co., supra; Iowa Southern Utilities Co. v. Cassill (C. C. A. 8) 69 F.(2d) 703; Frost v. Corporation Commission, supra.[2]

---

[2] In City of Campbell v. Arkansas-Missouri Power Co., supra, the Power Company owned and was operating an electric lighting system in the City of Campbell

We conclude that under the facts alleged in the bill the Electric Company is entitled to a decree enjoining the issuance of the bonds and any illegal diversion of funds received from the operation of the City waterworks, for the purpose of constructing a competing plant.

## II. Is the federal grant valid?

We pass by the question of the right of the Electric Company to challenge the constitutionality of title 2 of the National Industrial Recovery Act, (48 Stat. 200 [40 USCA § 401 et seq.]), or the acts of the Administrator thereunder, because we reach a conclusion adverse to the Electric Company on the broader question.

The pertinent portions of title 2 are set out in note 3.[3]

We are here only concerned with the power of Congress to make loans and grants to the States and their municipalities, to construct public projects.

under a non-exclusive franchise. The City proposed to construct its own electric generating plant and distributing system, and to enter into competition with the Power Company. It authorized a bond issue for that purpose and entered into a contract with Fairbanks, Morse & Company to purchase part of the equipment for such plant and system. The contract created a debt which the city was not authorized to incur. The Power Company brought a suit to enjoin the city from carrying out such contract and from operating such plant in competition with the Power Company. The trial court entered its decree granting the relief sought and the Appellate Court affirmed the decree. In its opinion the Appellate Court said:

"It is urged that, inasmuch as the plaintiff's franchise was not an exclusive one, it had no right to maintain this suit for injunctional relief. The plaintiff, however, had a franchise under which it was entitled to maintain and operate its lighting system in the city of Campbell, and it also had a contract with the city for street lighting. The fact alone that the plaintiff had this franchise would, of course, not prevent the city from erecting and maintaining a municipal light plant, if, in doing so, it did not exceed its power and authority. As the owner of this franchise, however, the plaintiff was entitled to relief against the illegal acts of others who might assume to exercise the privilege conferred upon it by its franchise. A franchise is property, and, as such, is under the protection of the law, and without express words it is exclusive as against all persons acting without legal sanction. True, plaintiff's franchise was not exclusive in the sense that the city might not grant similar right to another, yet it was exclusive against any one who assumed to exercise the privilege granted the plaintiff, in the absence of authority or in defiance of law. Volume 5, Pomeroy's Equity Jurisprudence § 2017. * * *

"We are clear that the plaintiff, as the holder of this franchise to maintain and operate the plant in defendant city, was entitled to protection against all illegal competition."

[3] Section 201, Title 2, National Industrial Recovery Act (40 USCA § 401) in part reads as follows:

"(a) To effectuate the purposes of this title [chapter], the President is hereby authorized to create a Federal Emergency Administration of Public Works, all the powers of which shall be exercised by a Federal Emergency Administrator of Public Works (hereafter referred to as the 'Administrator')."

Section 202, supra (40 USCA § 402), reads as follows:

"The Administrator, under the direction of the President, shall prepare a comprehensive program of public works, which shall include among other things the following: (a) Construction, repair, and improvement of public highways and park ways, public buildings, and any publicly owned instrumentalities and facilities; (b) conservation and development of natural resources, including control, utilization, and purification of waters, prevention of soil or coastal erosion, development of water power, transmission of electrical energy, and construction of river and harbor improvements and flood control and also the construction of any river or drainage improvement required to perform or satisfy any obligation incurred by the United States through a treaty with a foreign Government heretofore ratified and to restore or develop for the use of any state or its citizens water taken from or denied to them by performance on the part of the United States of treaty obligations heretofore assumed: Provided, That no river or harbor improvements shall be carried out unless they shall have heretofore or hereafter been adopted by the Congress or are recommended by the Chief of Engineers of the United States Army; (c) any projects of the character heretofore constructed or carried on either directly by public authority or with public aid to serve the interests of the general public; (d) construction, reconstruction, altera-

Section 8, article 1 of the Constitution provides:

"The Congress shall have Power

"To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States;"

In the first draft of the Constitution, the provision respecting taxation read: "The legislature of the United States shall have power to lay and collect taxes, duties, imposts, and excises." It contained no words qualifying or limiting the power granted.

Later certain matters, among them a proposition to secure the payment of the public debt, to appropriate funds exclusively for that purpose and to secure the public creditors from a violation of the public faith, when pledged by the authority of the legislature, were referred to a committee of five.

The committee of five reported that there should be added to the provision respecting taxation the following: "For the payment of the debts and the necessary expenses of the United States, provided, that no law for raising any branch of revenue, except what may be specially appropriated for the payment of interest on debts or loans, shall continue in force for more than ——— years."

Later a motion to amend the provision respecting taxation to read, "The legislature shall fulfil the engagements, and discharge the debts of the United States, and shall have power to lay and collect taxes, duties, imposts and excises," was adopted.

Thereafter it was proposed that the following be added thereto: "For the payment

---

tion, or repair under public regulation or control of low-cost housing and slum-clearance projects; (e) any project (other than those included in the foregoing classes) of any character heretofore eligible for loans under subsection (a) of section 201 of the Emergency Relief and Construction Act of 1932, as amended [section 605b of Title 15], and paragraph (3) of such subsection (a) shall for such purposes be held to include loans for the construction or completion of hospitals the operation of which is partly financed from public funds, and of reservoirs and pumping plants and for the construction of dry docks."

Section 203, supra (40 USCA § 403), in part reads:

"(a) With a view to increasing employment quickly (while reasonably securing any loans made by the United States) the President is authorized and empowered, through the Administrator or through such other agencies as he may designate or create, (1) to construct, finance, or aid in the construction or financing of any public-works project included in the program prepared pursuant to section 202 [section 402]; (2) upon such terms as the President shall prescribe, to make grants to States, municipalities, or other public bodies for the construction, repair, or improvement of any such project, but no such grant shall be in excess of 30 per centum of the cost of the labor and materials employed upon such project. * * * The provisions of this section and section 202 [section 402] shall extend to public works in the several States, Hawaii, Alaska, the District of Columbia, Puerto Rico, the Canal Zone, and the Virgin Islands."

Section 206, supra (40 USCA § 406), reads as follows:

"All contracts let for construction projects and all loans and grants pursuant to this title [chapter] shall contain such provisions as are necessary to insure (1) that no convict labor shall be employed on any such project; (2) that (except in executive, administrative, and supervisory positions), so far as practicable and feasible, no individual directly employed on any such project shall be permitted to work more than thirty hours in any one week; (3) that all employees shall be paid just and reasonable wages which shall be compensation sufficient to provide, for the hours of labor as limited, a standard of living in decency and comfort; (4) that in the employment of labor in connection with any such project, preference shall be given, where they are qualified, to ex-service men with dependents, and then in the following order: (A) To citizens of the United States and aliens who have declared their intention of becoming citizens, who are bona fide residents of the political subdivision and/or county in which the work is to be performed, and (B) to citizens of the United States and aliens who have declared their intention of becoming citizens, who are bona fide residents of the State, Territory, or district in which the work is to be performed: Provided, That these preferences shall apply only where such labor is available and qualified to perform the work to which the employment relates; and (5) that the maximum of human labor shall be used in lieu of machinery wherever practicable and consistent with sound economy and public advantage."

38

of said debts, and for the defraying the expenses that shall be incurred for the common defense and general welfare." The proposal was disapproved by a vote of ten to one. This left the clause, giving Congress unlimited power of taxation, as reported in the original draft. But the giving of an unlimited grant of power seems to have been unsatisfactory, because thereafter another committee reported that the clause respecting taxation should read as follows: "The legislature shall have power to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defence and general welfare of the United States." This report was unanimously approved.

Thus it will be seen that the clause " 'to pay the debts and provide for the common defence and general welfare of the United States,' * * * was first brought forward in connection with the power to lay taxes; that it was originally adopted as a qualification or limitation of the objects of that power; and that it was not discussed as an independent power, or as a general phrase pointing to or connected with the subsequent enumerated powers. There was another amendment proposed, which would have created a general power to this effect, but it was never adopted, and seems silently to have been abandoned." Story on the Constitution (5th Ed.) vol. 1, §§ 928, 929.

In the early history of the Nation the clause, "to * * * provide for * * * the general welfare of the United States," engendered much discussion, and divergent views were expressed by eminent statesmen and publicists.

Madison expressed the view that it is limited by the specifically enumerated powers granted to the Congress. He said: "Whenever * * * money has been raised by the general authority, and is to be applied to a particular measure, a question arises whether the particular measure be within the enumerated authorities vested in Congress. If it be, the money requisite for it may be applied to it. If it be not, no such application can be made." [4]

On the other hand Hamilton expressed the view that, subject to the qualifications that "all duties, imposts, and excises shall be uniform throughout the United States; * * * no capitation, or other direct tax,

shall be laid, unless in proportion to the census * * *," and "no tax or duty shall be laid on articles exported from any State" "the power to raise money is plenary and indefinite, and the objects to which it may be appropriated * * * no less comprehensive than the payment of the public debts, and the providing for the common defence and general welfare"; that the phrase general welfare "is as comprehensive as any that could have been used" and embraces "a vast variety of particulars, which are susceptible neither of specification nor of definition"; that it is "left to the discretion of the National Legislature to pronounce upon the objects which concern the general welfare, and for which * * * an appropriation of money is requisite and proper"; that "whatever concerns the general interest of learning, of agriculture, of manufacturers, and of commerce, are within the sphere of the national councils, as far as regards an application of money"; and that "the only qualification of the generality of the phrase * * * is * * * that the object * * * be general, and not local; its operation extending in fact or by possibility throughout the Union, and not being confined to a particular spot." [5]

In connection with his veto message of May 4, 1822, of "An Act for the Preservation and Repair of the Cumberland Road," President Monroe sent a statement to the House of Representatives which contains an elaborate discussion of the meaning of the phrase, "to pay the debts and provide for the common defence and general welfare."

He reaches the conclusion that the phrase gives Congress a right to appropriate public money and is "incidental to the great objects of the first branch of the grant, which authorizes Congress to lay and collect taxes."

He states that formerly he was inclined to the view the national government had no right to expend money except in performance of acts authorized by the other specific grants, but on further reflection and observation he had changed his view for reasons which he stated in part, as follows:

"The grant consists, as heretofore observed, of a two-fold power—the first to

---

[4] Madison's Report on the Virginia Resolutions; Elliott's Debates, vol. IV, p. 552.

[5] The Works of Alexander Hamilton (Lodge) vol. IV, pp. 150–154.

raise, and the second to appropriate, the public money—and the terms used in both instances are general and unqualified. Each branch was obviously drawn with a view to the other, and the import of each tends to illustrate that of the other. * * *

"If we look to the second branch of this power, that which authorizes the appropriation of the money thus raised, we find that it is not less general and unqualified than the power to raise it. More comprehensive terms than to 'pay the debts and provide for the common defence and general welfare' could not have been used. So intimately connected with and dependent on each other are these two branches of power that had either been limited the limitation would have had the like effect on the other. Had the power to raise money been conditional or restricted to special purposes, the appropriation must have corresponded with it, for none but the money raised could be appropriated, nor could it be appropriated to other purposes than those which were permitted. On the other hand, if the right of appropriation had been restricted to certain purposes, it would be useless and improper to raise more than would be adequate for those purposes. It may fairly be inferred that these restraints or checks have been carefully and intentionally avoided. The power in each branch is alike broad and unqualified, and each is drawn with peculiar fitness to the other, the latter requiring terms of great extent and force to accommodate the former, which have been adopted, and both placed in the same clause and sentence. Can it be presumed that all these circumstances were so nicely adjusted by mere accident? Is it not more just to conclude that they were the result of due deliberation and design? Had it been intended that the Congress should be restricted in the appropriation of the public money to such expenditures as were authorized by a rigid construction of the other specific grants, how easy would it have been to have provided for it by a declaration to that effect. The omission of such declaration is therefore an additional proof that it was not intended that the grant should be so construed."

He further expressed the view that the power of the national government to raise and appropriate money was not without limitation, saying:

"Have Congress a right to raise and appropriate the money to any and to every purpose according to their will and pleasure? They certainly have not. The government of the United States is a limited government, instituted for great national purposes, and for those only. Other interests are committed to the States, whose duty it is to provide for them. Each government should look to the great and essential purposes for which it was instituted and confine itself to these purposes." [6]

Mr. Joseph Story in his great work on the Constitution devotes many pages to an elaborate discussion of the meaning of section 8 of article 1. See sections 905 to 991, inclusive, Fifth Edition.

He holds that the provision with respect to taxation should be construed as if written, "The Congress shall have power to lay and collect taxes, duties, imposts, and excises, in order to pay the debts, and to provide for the common defence and general welfare of the United States." He rejects the Madison construction, and quotes with approval from Hamilton's report and Monroe's message, supra. He concludes, however, that the power of Congress to lay taxes and appropriate money is not unlimited, saying:

"§ 922. A power to lay taxes for any purposes whatsoever is a general power; a power to lay taxes for certain specified purposes is a limited power. A power to lay taxes for the common defence and general welfare of the United States is not in common sense a general power. It is limited to those objects. It cannot constitutionally transcend them. If the defence proposed by a tax be not the common defence of the United States, if the welfare be not general, but special, or local, as contradistinguished from national, it is not within the scope of the Constitution. If the tax be not proposed for the common defence, or general welfare, but for other objects, wholly extraneous (as, for instance, for propagating Mahometanism among the Turks, or giving aids and subsidies to a foreign nation, to build palaces for its kings, or erect monuments to its heroes), it would be wholly indefensible upon constitutional principles. The power, then, is, under such circumstances, necessarily a qualified power. * * * "

He then refers to the practical construction that had been placed upon section 8

of article 1 by the legislative and administrative branches of the government, saying:

"§ 991. In regard to the practice of the government, it has been entirely in conformity to the principles here laid down. Appropriations have never been limited by Congress to cases falling within the specific powers enumerated in the Constitution, whether those powers be construed in their broad or their narrow sense. And in an especial manner appropriations have been made to aid internal improvements of various sorts, in our roads, our navigation, our streams, and other objects of a national character and importance. In some cases, not silently, but upon discussion, Congress has gone the length of making appropriations to aid destitute foreigners and cities laboring under severe calamities; as in the relief of the St. Domingo refugees, in 1794, and the citizens of Venezuela, who suffered from an earthquake in 1812. An illustration equally forcible of a domestic character, is in the bounty given in the cod-fisheries, which was strenuously resisted on constitutional grounds in 1792, but which still maintains its place in the statute book of the United States."

To the last quotation from Story we may here appropriately add the following expression of the Supreme Court in Commonwealth of Massachusetts v. Mellon, 262 U. S. 447, 487, 43 S. Ct. 597, 601, 67 L. Ed. 1078:

"It is of much significance that no precedent sustaining the right to maintain suits like this has been called to our attention, although, since the formation of the government, as an examination of the acts of Congress will disclose, a large number of statutes appropriating or involving the expenditure of moneys for nonfederal purposes have been enacted and carried into effect."

See, also, "The New Deal and the Public Money," McGuire, Georgetown Law Journal Jan. 1935, pages 179–188.

This long unchallenged practical construction by the legislative and executive branches of the government is entitled to great weight.[7]

The decisions of the Supreme Court afford some aid in reaching the proper construction of Section 8 of Article 1.

In Gibbons v. Ogden, 9 Wheat. 1, 199, 6 L. Ed. 23, the court said:

"Congress is authorized to lay and collect taxes, &c., to pay the debts, and provide for the common defence and general welfare of the United States. This does not interfere with the power of the states to tax for the support of their own governments; nor is the exercise of that power by the states, an exercise of any portion of the power that is granted to the United States. In imposing taxes for state purposes, they are not doing what congress is empowered to do. Congress is not empowered to tax for those purposes which are within the exclusive province of the states."

In United States v. Gettysburg Electric Ry. Co., 160 U. S. 668, 16 S. Ct. 427, 429, 40 L. Ed. 576, the question was whether the government had power to condemn the land upon which the Battle of Gettysburg was fought. The court said the power of condemnation "results from the powers that are given, and it is implied because of its necessity, or because it is appropriate in exercising those powers. Congress has power to declare war, and to create and equip armies and navies. It has the great power of taxation, to be exercised for the common defense and general welfare."

In United States v. Realty Co., 163 U. S. 427, 16 S. Ct. 1120, 1125, 41 L. Ed. 215, the court said:

"It is unnecessary to hold here that congress has power to appropriate the public money in the treasury to any purpose whatever which it may choose to say is in payment of a debt or for purposes of the general welfare. A decision of that question may be postponed until it arises."

There is no finer example of expert draftsmanship of fundamental law than the Constitution of the United States. Words were chosen and employed with meticulous care, and surplusage was scrupulously avoided. Section 8 of article 1 confers on the Congress seventeen specifically enumerated powers, and each clause is separated by a semicolon.[8]

---

[7] McGrain v. Daugherty, 273 U. S. 135, 174, 47 S. Ct. 319, 71 L. Ed. 580, 50 A. L. R. 1; Wheeler Lumber Bridge & Supply Co. of Des Moines v. United States, 281 U. S. 572, 576, 50 S. Ct. 419, 74 L. Ed. 1047; Smiley v. Holm, 285 U. S. 355,

369, 52 S. Ct. 397, 76 L. Ed. 795; Missouri Utilities Co. v. City of California (D. C.) 8 F. Supp. 454, 461.

[8] In the U. S. Stat. vol. 1, p. 13, the clauses are separated by colons.

To these is added the following: "To make all laws which shall be necessary and proper for carrying into execution the foregoing powers."

If the taxing power were limited to the power to lay taxes to effectuate the sixteen specific powers that follow it, the taxing clause would be mere verbiage, because the power last quoted authorizes the Congress to make all laws necessary and proper to carry into execution the sixteen specific powers granted by the provisions which precede it. By the plain meaning of the language employed, Congress is given a specific and independent grant of power to lay and collect taxes to pay the debts and provide for the common defense and general welfare of the United States. This, and the long practical construction given the taxing clause, leads us to reject the Madison interpretation.

We conclude that section 8 of article 1 gives Congress the power of taxation and limits the purposes for which taxes may be levied and appropriated, namely, to pay the debts and provide for the common defense and general welfare of the United States.

We further conclude that the phrase "general welfare" is not limited by the specifically enumerated powers, but that the welfare must be national or general as contradistinguished from local or special.

Does Title 2 of the National Industrial Recovery Act, in authorizing loans and grants to the States and municipalities for constructing public works or projects, provide for the "general welfare," as we have construed those words in the Constitution?

That is a question to be determined in the first instance by the Congress, and in determining what will provide for the general welfare, Congress must be accorded wide discretion. With its determination the courts may not interfere unless it clearly and indubitably appears that the purpose for which a tax is to be laid, collected and appropriated is not within the limitations fixed by the Constitution.

There was general unemployment. Millions were dependent upon private charity and public relief for food and shelter. The situation was national in its scope. Private charities and local governmental agencies were not meeting the widespread need for relief.

Two of the declared objects of the Act were to "rehabilitate industry" and "to reduce and relieve unemployment."

The Act authorizes the President to create a Federal Emergency Administration of Public Works, to be administered by an "Administrator." It provides that the Administrator shall provide a comprehensive program of public works.

It authorizes and, we think, directs the President, within specified limits and in the exercise of a reasonable administrative discretion, to make the loans and grants provided for in section 203 (40 USCA § 403) to projects included in the program.

True, such a public works project, when viewed by itself, is local in character; however, when viewed as an integral part of a comprehensive plan and program, it may be national in scope and character.

Nor can we say that such loans or grants would constitute expenditures for a private as distinguished from a public purpose. The purposes to be accomplished were the reduction of unemployment and the rehabilitation of industry, to the end that the government should be freed of the public burden of relief for the needy.

While at common law there is no legal duty resting upon the State to provide for the relief of the poor or indigent,[9] it is now generally recognized that the care of the indigent is a proper governmental function, and statutes making provisions therefor have been enacted in England and generally in the several States of the Union.[10]

[9] Cerro Gordo County v. Boone County, 152 Iowa, 692, 133 N. W. 132, 39 L. R. A. (N. S.) 161, Ann. Cas. 1913C, 79; Mandan Deaconess Hospital v. Sioux County, 63 N. D. 538, 248 N. W. 924; Wood v. Boone County, 153 Iowa, 92, 133 N. W. 377, 39 L. R. A. (N. S.) 168, Ann. Cas. 1913D, 1070; Saguache County v. Tough, 45 Colo. 395, 101 P. 411; Davis v. Milton Plantation, 90 Me. 512, 38 A. 539; Inhabitants of Plymouth v. Wareham, 126 Mass. 475; Roane v. Hutchinson County, 40 S. D. 297, 167 N. W. 168.

[10] Cerro Gordo County v. Boone County, 152 Iowa, 692, 133 N. W. 132, 134, 39 L. R. A. (N. S.) 161, Ann. Cas. 1913C, 79; Busser v. Snyder, 282 Pa. 440, 128 A. 80, 37 A. L. R. 1515; Beck v. Board of Commissioners, 105 Kan. 325, 182 P. 397; Jones v. Cooney, 81 Mont. 340, 263 P. 429, 430; In re Opinion of the Justices, 85 N. H. 562, 154 A. 217, 221; Rummens

If the government may appropriate money for the relief of the indigent, where the need is national in scope and character, may it not accomplish that end indirectly by promoting State and municipal public works throughout the Nation in order to stimulate industry, and reduce unemployment, and is not the means to accomplish the end a matter for congressional determination?

Nor does the federal government by making loans and grants under this Act encroach on the sovereign rights of the States. It does not enter the territorial limits of the States and there, through its own agencies or instrumentalities, engage in a non-federal activity. It simply advances funds by loans or grants to States and their agencies, to carry out their own powers to construct public projects, for the purpose of promoting the general welfare of the United States.

With the wisdom or expediency of the Act we are not concerned. Those are questions exclusively for legislative determination.[11]

Under the facts and circumstances existing at the time of the enactment of Title 2, we cannot say, from the facts well pleaded, that it clearly and indubitably appears its provisions, with respect to loans and grants to States and municipalities for the construction of public projects, would not promote the general welfare of the United States, nor that the Congress in providing for such loans and grants transcended its constitutional powers.

Does title 2 undertake unconstitutionally to delegate legislative powers to the President?

Section 202 thereof (40 USCA § 402) provides that "the Administrator, under the direction of the President, shall prepare a comprehensive program of public works, which shall include" the several classes of public works enumerated in sub-sections a, b, c, d, and e thereof.

Section 203 (40 USCA § 403) authorizes the President with a view to increasing employment quickly, to make reasonably secured loans to carry out any public works project included in the program, and to make grants to States, municipalities or other public bodies for the construction, repair, or improvement of any such project.

Section 206 (40 USCA § 406) limits the projects to which loans or grants may be made by imposing restrictions calculated to increase employment.

Section 203 (40 USCA § 403) authorizes loans and grants in all of the several States, and in Hawaii, Alaska, District of Columbia, Puerto Rico, the Canal Zone, and the Virgin Islands.

Thus it will be seen that the Act provides, first, for the preparation of a "comprehensive" public works program and specifically enumerates a large number of classes of projects that must be included therein.

It then authorizes the President to make reasonably secured loans to carry out any project included in the program, and to make grants for the construction, repair, or improvement of any such project, with a view to increasing employment quickly, and within the limitations of section 206.[12]

In Panama Refining Co. v. Ryan, 293 U. S. 388, 421, 55 S. Ct. 241, 248, 79 L. Ed. 446, the court said:

"Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national Legislature cannot deal directly. The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply. Without capacity

v. Evans, 168 Wash. 527, 13 P.(2d) 26, 29; City and County of San Francisco v. Collins, 216 Cal. 187, 13 P.(2d) 912.

See also cases cited in Note 9.

11 German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 414, 34 S. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189; McCray v. United States, 195 U. S. 27, 54, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561; Atlantic Coast Line R. Co. v. State of Georgia, 234 U. S. 280, 288, 34 S. Ct. 829, 58 L. Ed. 1312; Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 564, 31 S. Ct. 259, 55 L. Ed. 328; McLean v. State of Arkansas, 211 U. S. 539, 547, 29 S. Ct. 206, 53 L. Ed. 315.

12 Appropriations to carry out the National Industrial Recovery Act were made by the Fourth Deficiency Act, fiscal year 1933, 48 Stat. 275, and the Emergency Appropriation Act, fiscal year 1935, 48 Stat. 1055.

to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility."

See, also, A. L. A. Schechter Poultry Corporation v. United States, 55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947, decided May 27, 1935.

Section 202 (40 USCA § 402) lays down a standard as to the program of public works. It provides the program must be comprehensive and must include certain specified classes. Manifestly the Congress could not enumerate specifically the particular projects to be included in such a broad program.

We are not called upon to decide whether the Congress could delegate to the President power to include in such program other classes of projects than those enumerated in section 202, because the project here involved falls within a specifically enumerated class.

Sections 203 and 206 (40 USCA §§ 403, 406) lay down standards as to what projects may be financed or aided by loans or grants. They must be public works projects; they must be projects included in the program; they must come within the limitations specified in section 206; a loan or grant must be made with a view to increasing employment quickly, and a loan must be reasonably secured.

The making of such a loan or grant is administrative rather than legislative in character.

■ Congress may not delegate power to make a law, but it may confer an authority or discretion as to its execution, to be exercised under and pursuant to the law. J. W. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 407, 48 S. Ct. 348, 72 L. Ed. 624.

But, it is argued that Title 2 does not expressly command the President to make loans or grants to aid in the construction of any project, and that under it he may act or refuse to act, as he may elect.

It is plain that the determination of whether a loan or grant should be made to carry out a particular project had to be left to administrative discretion. The Congress could not specify particular projects nor deal with applications for loans or grants for particular projects.

Against the background of the conditions then confronting the Nation, and reading the Act in the light of the purposes and objects intended to be accomplished, it seems reasonably clear to us that Congress intended to direct the President to relieve unemployment by administrative acts, within channels prescribed by sufficient definiteness.

The words "authorized and empowered" were intended and should be construed as directing the President to select, from those classes of projects specifically designated by Congress, the particular ones, within the limitations specified, best calculated to effectuate the purpose of the Act. Latterly, it has become the general practice to use the word "authorized" in the sense of empowered and directed in Acts prescribing administrative action, the more mandatory form of expression being deemed not appropriate when giving direction to high executive officers of the government.

■ We believe the Act may be and should be construed as implying a direction to the President to carry out and effectuate its purposes, and to make loans and grants, within the limits of a reasonable discretion, for projects within the program. It clearly is our duty to construe the Act, if fairly possible, "so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score." [13]

■ We conclude the Congress, at least as to the classes of projects specifically enumerated, lays down a legislative standard and declares a legislative policy with requisite definiteness, and impliedly directs the President to effectuate the purposes of the Act and to make loans and grants, within the limits of a reasonable administrative discretion, to projects that fall within the classes enumerated in section 202 and the limitations of sections 203 and 206, and that, while Title 2 grants broad administrative authority and discretion, it does

---

[13] United States v. Jin Fuey Moy, 241 U. S. 394, 401, 36 S. Ct. 658, 60 L. Ed. 1061, Ann. Cas. 1917D, 854; Carey v. State of South Dakota, 250 U. S. 118, 122, 39 S. Ct. 403, 63 L. Ed. 886; United States v. La Franca, 282 U. S. 568, 574, 51 S. Ct. 278, 75 L. Ed. 551; Interstate Commerce Commission v. Oregon-Washington R. & Nav. Co., 288 U. S. 14, 40, 53 S. Ct. 266, 77 L. Ed. 588; George Moore Ice Cream Co., Inc., v. Rose, 289 U. S. 373, 379, 53 S. Ct. 620, 77 L. Ed. 1265.

not unconstitutionally delegate legislative power.

■ We are of the opinion the grant in this case is not subject to attack because of the alleged policy of the Administrator to refuse loans or grants where an existing privately owned utility will reduce its rates and adopt rules and regulations for the rendition of services that are agreeable to the views of the Administrator, and make loans or grants where the utility will not so reduce its rates and adopt such rules and regulations, for these reasons:

First, the allegation is general. It is not alleged the Administrator acted to effectuate that policy in the instant case.

Second, the Administrator is not a party-defendant.

The decree is reversed and the cause remanded with instructions to grant a temporary injunction against the issuance of the revenue bonds and any unlawful diversion of waterworks funds, to overrule the motion to dismiss the bill, and to proceed further in accordance with this opinion.

The costs will be assessed against the City.

LEWIS, Circuit Judge. (concurring specially).

I agree to what has been said, except the parts relative to appellant's right to compete with the city, and believe that constitutes another independent ground which requires reversal.

The bill, dismissed on motions of defendants, alleges that the city had granted appellant the right and franchise to engage in the business of furnishing electric current to its inhabitants and the public and to occupy the streets and public places of the city for that purpose; that in carrying on its business it had been and was furnishing for a consideration and at a profit electric current to the city, among others, and that it had been and was furnishing power and light to the city's water works, pumping plant, sewage disposal plant, city hall, memorial hall, city park, and the city system of white-way street lights, and had expended large sums of money and made large investments in establishing the facilities and equipment in the city for the purpose of rendering itself able to furnish said service to the city and to the public; that it is the only producer or distributor of electricity operating in the city and available to supply the needs of the city with such service; that its service is and at all times has been adequate and satisfactory, and there have been no complaints or proceedings of any sort instituted on account of any claimed inadequacy or insufficiency with respect thereto; that it has expended large sums of money and made large investments in establishing its facilities and equipment and pays taxes thereon; that the city now threatens to acquire and install electric generating and distributing machinery and equipment in order to be able to withdraw and discontinue its patronage and business with appellant by itself furnishing power and light to its water works pumping plant, sewage disposal plant, and to itself light the city hall, memorial hall, city park and system of whiteway street lighting, and its intentions in this respect are manifested by its resolutions and applications which it has made to the Federal Emergency Administration of Public Works for a loan of money to it by the United States and a grant of a sum of money from the United States pursuant to title 2, National Industrial Recovery Act (48 Stat. 200–210, 40 USCA § 401 et seq.) to finance and carry out its intention; that its services have been dependable, adequate and satisfactory and its rates reasonable, and it is at all times subject to state regulatory power of the Corporation Commission of Kansas to insure that its service will continue to be adequate, satisfactory, and its rates reasonable. It is further alleged that the threatened acts, if carried out by the city, would be to the great damage of appellant and without lawful right on the part of defendant. Other allegations of the bill admitted by the demurrer, allegations in a supplement to the bill, and resolutions of the city commissioners, all appearing in the record, disclose in more detail the proposed action to be taken by defendants. The purpose of the proposed project seems to be to equip the city's water works plant with electric pumping facilities, and in doing so the city commissioners appear to have concluded to make the equipment of sufficient capacity to also light the city hall, memorial hall, city park, and the so-called white-way street lights. These allegations with exhibits and the reasonable inferences to be drawn therefrom seem to me to threaten unlawful and injurious conduct to appellant on the part of the city.

It is admitted that the franchise granted to appellant is not an exclusive one. The

city is at liberty to install an electric lighting plant that can supply the needs of the city and of its inhabitants, or either of them, but even then appellant would have the right of competition with the city. The relations between appellant and the city under appellant's franchise are contractual, and the proposed action of the city threatens to arbitrarily withdraw from appellant that right of competition as to the city's needs. This to me seems to be a threatened breach of contract. In City of Walla Walla v. Walla Walla Water Co., 172 U. S. 1, at page 9, 19 S. Ct. 77, 81, 43 L. Ed. 341, the court said: "But it is sufficient for the purposes of this case to say that this court has too often decided, for the rule to be now questioned, that the grant of a right to supply gas or water to a municipality and its inhabitants through pipes and mains 'laid in the streets, upon condition of the performance of its service by the grantee, is the grant of a franchise vested in the state in consideration of the performance of a public service, and, after performance by the grantee, is a contract protected by the constitution of the United States against state legislation to impair it."

Cooley's Constitutional Limitations (5th Ed.) p. 337, reads thus:

"Those charters of incorporation, however, which are granted, not as a part of the machinery of the government, for the private benefit or purposes of the corporators, stand upon a different footing, and are held to be contracts between the legislature and the corporators, having for their consideration the liabilities and duties which the corporators assume by accepting them; and the grant of the franchise can no more be resumed by the legislature, or its benefits diminished or impaired without the consent of the grantees, than any other grant of property or valuable thing, unless the right to do so is reserved in the charter itself."

Fletcher Cyc. Corporations, vol. 2, closes discussion of the subject with section 1185, thus: "The effect of granting a franchise to use streets to a public service company may be briefly summarized as follows: * * * 3. The franchise is a contract within the constitutional provision prohibiting the impairment of contracts, * * *." This right of competition under circumstances such as we have here is recognized in Knoxville Water Co. v. Knoxville, 200 U. S. 22, 26 S. Ct. 224, 50 L. Ed. 353, and in City of Joplin v. Southwest Missouri Light Co., 191 U. S, 150, 24 S. Ct. 43, 48 L. Ed. 127.

The Kansas statute in broad terms (Rev. St. 1923, 12—841) authorized the grant to appellant, and in like broad terms (12—842) it authorized the city to purchase or construct electric light, power and heating plants for the purpose of supplying the city and its inhabitants, but there is no statute as to appellant's rights under the conditions which the city threatens to bring about.

The consideration for the grant to appellant was that appellant on the one hand should make the necessary outlay to furnish the service at reasonable rates, which appellant has done, and that the city and its inhabitants who might desire to use the service would pay appellant reasonable compensation therefor. These are the qualities of a contract, which the city and its commissioners threaten to break in part only, that is, to exclude appellant from competition with it in furnishing light for city buildings, public grounds and part of the streets.